F.E. MYERS COMPANY, A DIVISION OF McNEIL CORPORATION, and the State of Delaware for the use and benefit of F.E. Myers Company, Plaintiffs,

v.

PIPE MAINTENANCE SERVICES, INC., and Transamerica Insurance Company, Defendants.

Civ. A. No. 83–761–JLL.

United States District Court, D. Delaware.

Dec. 6, 1984.

Daniel F. Wolcott, Jr., of Potter, Anderson & Corroon, Wilmington, Del., for plaintiffs.

Thomas C. Crumplar of Jacobs & Crumplar, P.A., Wilmington, Del., and Nicholas Guarente, Media, Pa., of counsel, for defendants.

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

This action arises out of an agreement involving the purchase and sale of equipment used in the construction of a sewage disposal system at Bellevue State Park ("Bellevue"), New Castle County, Wilmington, Delaware. F.E. Myers Company ("Myers") asserts in its complaint that Pipe Maintenance Services, Inc. ("PMS"), the general contractor responsible for installing the sewage collection project at Bellevue, agreed to purchase materials from Myers for use by PMS in connection with its construction contract with the State of Delaware, and that PMS has refused to pay for the materials specified in the contract after demand was made by Myers. Myers also claims that because defendant PMS executed as principal, and defendant Transamerica Insurance Co., executed as surety a payment bond in connection with the State of Delaware contract, the defendants, as a result of their default under the bond by failing to pay Myers, are jointly and severally liable for $31,868, the total price of the supplied materials.

In its answer PMS denies that the $31,868 is due to Myers by reason of a counterclaim for damages of $15,777.83 because of Myers' late performance, defective materials supplied and the wrongful refusal to warrant and guarantee the materials supplied.

The case was tried to the Court without a jury on August 14, 1984.

After carefully considering the sufficiency and weight of the testimony adduced at trial, the demeanor of the witnesses who testified, the exhibits admitted into evidence and the post trial memoranda filed by the parties, the Court makes the following findings of facts and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

FINDINGS OF FACTS

1. Myers is a division of McNeil Corporation, a corporation organized under the laws of the State of Ohio with its principal place of business in the State of Ohio. (Docket Item ["D.I."] 1, 5.) PMS is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Exton, Pennsylvania. (Id.) Transamerica Insurance Company is a corporation organized under the laws of the State of California, has its principal place of business in Philadelphia, Pennsylvania, and is authorized to do business in the State of Delaware under the Delaware Insurance Code. (Id.) The amount in controversy exceeds $10,000, exclusive of costs and interest.

2. In July of 1982, Mechem Company ("Mechem") obtained the plans and specifications from the State of Delaware for the proposed construction of a grinder pump pressure collection system[1] at Bellevue State Park. (Tr–A at 170.)[2] Mechem, a distributor for various pump manufacturers, then submitted proposals for pump equipment to the general contractors who were planning to submit bids to the State of Delaware on the Bellevue project. (Id.)

3. On August 3, 1982, PMS was awarded the contract (No. BEL–100–1982) entitled Grinder Pump Pressure Collection System, Bellevue State Park, New Castle County, by the Department of Natural Resources and Environmental Control, Division of Parks and Recreation for the State of Delaware. (PX 1.)

4. On August 18, 1982, PMS as principal, and Transamerica Insurance Co. as surety, executed in connection with the Bellevue project a payment bond which provided that it shall be discharged upon the payment to:

"all and every person furnishing material or performing labor in and about the construction of said Project, all and every sum of money due him, them or any of them, for all such labor and materials for which the contractor is liable."

(PX 2.)

5. Mechem then approached PMS to determine whether Mechem's proposal was satisfactory. (Tr–A at 170.) Although PMS indicated that Mechem's prices were favorable, inasmuch as Mechem was only the distributor[3] and not the original manufacturer, there were some questions as to specifications that needed to be answered. (Id. at 171.) Mechem had included the specifications of pumps manufactured by Myers, however, the Myers pumps, as originally designed, did not meet the specifications for the Bellevue project.[4]

6. On August 20, 1982, there was a meeting among PMS, Hans C. Albertsen, as the owner of Mechem, and the representatives from the state including the engineer at Bellevue. Subsequent to that meeting, Albertsen sent a letter to Harold M. Miller of Andrews, Miller & Associates, the state engineers, in which Albertsen stated that his firm, as the local representative for F.E. Myers, could provide the five

---

1. Grinder pumps are large submersible sewage pumps with a grinding device on the end of the shaft which emasculates waste and then discharges it. (D.I. 19 at 18.)

2. References to the plaintiffs' and the defendants' exhibits are cited herein as "PX" and "DX" respectively, and to the two volumes of the trial transcript (D.I. 17 & 19) as "Tr–A" and "Tr–B."

3. Apparently, Myers equipment is distributed by a number of companies in the area including Mechem and Sani-Services. (Tr–A at 204.)

4. The pumps that Myers manufactured were almost identical to the pumps specified in the contract except that Myers' pumps had steel basins and the State of Delaware requested pumps with fiberglass basins. (Tr–A at 172.)

grinder pumps needed for the Bellevue project.[5] (Tr–A at 102–103; DX 2.)

7. On September 7, 1982, Albertsen submitted a proposal[6] to Michael Carpenter, project coordinator for PMS. (Tr–A at 35; DX 1.) The proposal,[7] Mechem's price for five grinder pumping stations[8] and one winch unit, was for $31,869.00.[9]

8. On October 1, 1982, Michael Carpenter of PMS verbally authorized Albertsen to proceed with the purchase of the grinder pumps. However, Albertsen told Carpenter that a written purchase order was needed to process the order. (Tr–A at 174.)

9. Because the Myers pumps were not the ones originally specified, the State of Delaware decided to have their consulting engineers evaluate the Mechem submission. (Tr–A at 172.) At the time of the original submission, the State did not have consulting engineers under contract because they had already done their work on the project and been paid. (Id. at 171.)

10. On October 7, 1982, Carpenter submitted the information to Steve Corazza of the Department of Natural Resources & Environmental Control for approval by the consulting engineers, Andrews, Miller & Associates. (PX 3.) Albertsen received the approved drawings dated October 13, 1982. (Id. at 197.)

11. A few days after October 21, 1982, Albertsen received a letter of approval from the consulting engineer and on October 25, 1982, PMS submitted a purchase order to Mechem for the five grinder pumps.[10] (DX 3.)

12. After Mechem received the written purchase order from PMS, Mechem submitted the approved drawings and the purchase order for the five grinder pumps to Myers. (Tr–A at 175.)

13. At the end of October, Myers was shut down three days for annual inventory. In addition, Myers experienced a major reduction in its work force due to poor business conditions during the time the equipment was being manufactured. (DX 7.) Myers, however, completed production of the equipment sometime between the middle of November and the first week of December. (Tr–A at 191, 207.)

14. In early December, 1982, Myers contacted Mechem concerning the PMS contract and Mechem's outstanding bal-

---

5. In his letter to Harold Miller dated August 23, 1982, Albertsen stated:

> "At the request of the successful contractor, Pipe Maintenance Service, I attended a meeting at Bellevue State Park on August 20, 1982.
>
> . . . .
>
> It was emphasized that timing is critical because of various commitments by the Division of Parks and Recreation, and the contractor is committed to make every effort to plan his work to coinside [sic] with certain dates and activities.
>
> . . . .
>
> I have the assurance by our factory that they can ship the stations in approximately six weeks from date of authorization to proceed . . . ."

(DX 2.) The original production schedule for delivery 4–6 weeks after "receipt of order or approved drawing" was later changed to 6–8 weeks because of subsequent engineering changes. (Tr–A at 175.)

6. The proposal submitted to and ultimately accepted by PMS was from Mechem and not Myers. (DX 3.) Mechem is a sales representative for various companies all of which are in the business of water and waste treatment. It has two relationships with its clients: one in which the manufacturer sells directly to the contractor (Tr–A at 169) and one in which Mechem purchases the equipment directly from the manufacturer and then sells to the contractor. After Mechem got paid then they would pay the company. Mechem's relationship with Myers is the latter. (Id. at 170.)

7. At that time, the only matter that was unresolved related to the horsepower rating of two pumping stations. .(DX 1.)

8. A pumping station consists of a pit in the ground in which a pump is installed. A control panel for the pump is located away from the station itself and is wired to the pump through conduit which runs from the control panel to a junction box near the pump in the pump pit. (Tr–A at 7; PX 4.)

9. All parties, however, have agreed that the total price charged by Myers to PMS was $31,868.00. (D.I. 1, 5.)

10. The purchase order included the statement: "This purchase order subject to the engineers acceptance and final approval of this equip." (DX 3.)

ances to Myers.[11] (Tr–A at 177.) Because it was a policy at Myers not to ship on credit if there was an outstanding balance due, Myers asked Albertsen whether he had a line of credit to cover the $35,000 purchase. Albertsen did not carry one and could not obtain one because of the time involved. (*Id.*) Therefore, Myers asked Albertsen if it would be acceptable if Myers dealt directly with PMS. Albertsen agreed.

15. Myers then contacted PMS and received documentation concerning PMS's financial capabilities. (*Id.* at 178; DX 6.) When Myers was satisfied with PMS's financial soundness, it caused the pumps to be shipped to Bellevue. The equipment for the Bellevue project arrived at the project on January 4, 1983. (DX 8.)[12]

16. On January 20, 1983, PMS requested by letter and was granted an extension of time for completion of the contract until March 16, 1983. (Tr–A at 110, 116; DX 9.)

17. When the equipment was delivered to the job site, Albertsen was there to assemble the equipment finger tight.[13] All parts which were necessary for the operation of the pumps were on site. (Tr–A at 178–79.)

18. PMS had allocated sixteen (16) days for the completion of the installation of the grinder pumps. (Tr–A at 137; DX 4.) The

size of the crew PMS allocated for the installation consisted of six people including an equipment operator, three laborers, one mechanic and a supervisor. (*Id.* at 58.) However, at no time during the installation did PMS provide the proposed six-person crew.[14]

19. Albertsen was also on site when the pumps were first operated on February 25, 1983. (Tr–A at 38, 39.) Although the state inspector indicated he was satisfied with the operation (*id.* at 181–82), a problem subsequently arose with respect to defective check valves at three grinder pump stations.[15] (*Id.* at 182, 216.)

20. On March 15, 1983, a decision was made to get replacement check valves and by April 18, 1983, three check valves were replaced. (Tr–A at 48.)

21. Even after the three check valves were replaced, the pumps still did not function properly. Therefore, in May of 1983, Steve Corazza from the State of Delaware Parks Department contacted PMS and indicated that Ralph Weeks of Sani-Services, a sales and service organization which specializes in grinder pumps, waste pumps and effluent pumps, was going to Bellevue to determine the problem. (Tr–A at 6, 11, 140.) PMS agreed to pay the Sani-Services expenses[16] in order to resolve the issues

---

**11.** Timothy Sewell, Credit Manager of Myers (Tr–B at 19), indicated that Myers had credit concerns with Mechem from October through December 1982. (*Id.* at 25; PX 5.) There were several contacts between Myers and Mechem during December regarding the past due account which showed that Mechem, at least as of December 19, 1983, was past due $4,681.58. (*Id.* at 26–29.)

**12.** David Bauer, Northeast District Sales Manager for Myers, stated that the equipment was manufactured and ready to ship by the middle of November but it was held up because Myers was unwilling to extend additional credit to Mechem. (Tr–A at 207.)

**13.** Somers, PMS's foreman on the Bellevue project, had never installed a grinder pump prior to this project. (Tr–A at 53.)

**14.** From January 4, 1983 to February 25, 1983, the period of installation, while the foreman was on site 27 days, an operator designated as such was on site only 1 day, 2 laborers were on

site only 11 days, and only 1 laborer was on site 15 days. (DX 10.)

**15.** The problem with the check valve was that the valve did not exactly face against the housing to absolutely prevent any backflow. Apparently once enough fluid would pass into the chamber behind the valve, it would appear to flip wide open and allow fluid to flow back into the well as rapidly as the pumps were able to pump it out. (Tr–A at 40.)

**16.** There were invoices sent to the Division of Parks and Recreation from Sani-Services for the electrical work, for miscellaneous parts and supplies totaling $5,959.42. PMS authorized the payment of the invoices, while it questioned a $129.00 charge that was not identified. (Tr–B at 41.)

concerning the contract and to facilitate dedication of the park for the State of Delaware. (Tr–B at 37.)

22. Weeks discovered that the controls for the pumps malfunctioned due to improper wiring and water in the junction box. (Tr–A at 9.) The wiring which was done in the control panel was the responsibility of PMS. (Tr–B at 37.)

23. Although Weeks found nothing wrong with the grinder pumps, subsequent to his visit, other check valves were replaced and three redundant check valves manufactured by Nebco were installed. (Tr–B at 13; Tr–A at 11, 14, 25.)

24. On February 9, 1983, PMS made a payment application to the State of Delaware for a period between November 30, 1982 and January 24, 1983. (PX 24 at 3.) PMS certified that the work at Bellevue was performed during that period of time. PMS was paid pursuant to that application in March, 1983.

25. Myers refused to warrant the pumps until the defect in the electrical system had been corrected. (Tr–B at 8.)

26. As of August, 1984, the installation of the grinder pump pressure collection system at Bellevue had not been accepted by the State of Delaware because of the electrical and field installation problems. (Tr–B at 35–36.)

CONCLUSIONS OF LAW

1. Jurisdiction exists by virtue of 28 U.S.C. § 1332 (1976).

2. Because jurisdiction is based on diversity of citizenship, the Court is required to apply Delaware's conflict of laws rules. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Where substantive issues of interpretation of a contract are involved, the Delaware courts have more recently utilized the modern and flexible "most significant relationship to the transaction" test set forth in the Restatement (Second) of Conflict of Laws § 188(1). *Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160 (Del.1978). *See Hill v. Equitable Trust Co.*, 562 F.Supp.

1324 (D.Del.1983); *Process and Storage Vessels, Inc. v. Tank Service, Inc.*, 541 F.Supp. 725 (D.Del.1982); *Sellon v. General Motors Corp.*, 521 F.Supp. 978 (D.Del. 1981). In applying this principle the Court must consider: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2).

3. Inasmuch as: (1) the State of Delaware, for the use and benefit of F.E. Myers, Co., is a plaintiff in this case; (2) the place of performance and the location of the subject matter of the contract (Bellevue State Park, New Castle County) are located in Delaware; and (3) one of the defendants, Transamerica Insurance Co., is legally authorized to do business in Delaware, the law of Delaware governs this case.

In addition, because this case involves a transaction for the sale of goods, the Delaware Uniform Commercial Code—Sales ("Code") applies. 6 *Del.C.* §§ 2–101, 2–102 (1974).

4. Under Delaware law, the party asserting an agency relationship has the burden of proving it. *Facciolo v. State of Delaware*, 358 A.2d 880 (Del.1976); *Taylor v. Armiger Body Shop*, 40 Del.Ch. 22, 172 A.2d 572 (1961). In the present case, PMS argues that: (1) Mechem was the "authorized agent" of Myers with respect to grinder pump stations; (2) *both Myers and Mechem* failed to act in good faith and in a commercially reasonable manner; and (3) Myers *and Mechem* caused the delay in the delivery to PMS of the five grinder stations. (D.I. 21 at 6, 24.) However, PMS has failed to provide any proof of an agency relationship between Myers and Mechem. To the contrary, Albertsen testified that Mechem acts as a distributor for a number of companies including Myers. Mechem purchases components from the manufacturers and in turn sells the equip-

ment to a buyer. Additionally, Mechem does its own billing and oftentimes it does some design work. (Tr–A at 170.)

5. In view of the fact that Mechem is not a party to this litigation and that PMS has failed to prove that Mechem is an agent capable of binding Myers contractually to PMS, Mechem's alleged promise to PMS concerning the expected delivery date of the grinder pumps is not binding upon Myers.

6. Myers is required to put and hold conforming goods at the buyer's disposition pursuant to the terms of the agreement. 6 *Del.C.* § 2–503. It was not until Mechem submitted the approved drawings and order for the five grinder pumps in October, 1982, that Myers entered into a contractual relationship with Mechem.

7. In order to meet its contractual obligations, Myers was required to deliver five (5) Grinder Pump Stations manufactured in accordance with the plans and specifications for the State of Delaware, Department of Natural Resources and Environmental Control contract # BEL–100–1982. Although Mechem had estimated a delivery date 6–8 weeks after the written purchase order, Myers did not guarantee or specify a particular delivery date.

8. PMS is only entitled to damages for delay in delivery if it proves that Myers breached the contract by delivering the pumps on January 4, 1983, and that the delay was the proximate cause for its increase in costs.[17] *S.J. Groves & Son Co. v. Warner Co.*, 576 F.2d 524 (3d Cir.1978); *Lichter v. Mellon-Stuart Co.*, 305 F.2d 216 (3d Cir.1962); *Commercial Credit Corp. v. C.F. Schwartz Motor Co., Inc.*, 251 A.2d 353 (Del.Super.1969); *Hajoca Corp. v. Security Trust Co.*, 41 Del. 514, 25 A.2d 378 (Del.Super.1942).

9. The facts indicate, however, that no delay is attributable to Myers because the five grinder pumps were received by PMS within a reasonable time[18] after the December agreement between PMS and Myers.

10. A warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. 6 *Del.C.* § 2–314(1).

11. The elements of the merchantability cause of action that a claimant must prove are: (1) that a merchant sold goods, (2) which were not "merchantable" at the time of sale, and (3) injury and damages to the claimant or his property (4) which was proximately and in fact caused by the defective nature of the goods, and (5) notice to seller of injury. Although PMS argues and Myers concedes that Myers delivered grinder pumps with defective check valves, the burden remains on the claimant to establish a "proximate causal relationship" between any breach of the agreement and the damages caused. *Commercial Credit Corp. v. C.F. Schwartz Motor Co., Inc.*, 251 A.2d 353 (Del.Super.1969). Additionally, if the loss caused by the breach cannot be isolated from that attributable to other factors, no damages may be awarded. *See S.J. Groves & Son Co. v. Warner Co.*, 576 F.2d 524 (3d Cir.1978).

12. While it is clear that the grinder pumps as delivered in January, 1983, contained some defective check valves, it is also apparent that the check valves were *not* the *sole proximate cause* of the alleged damages to PMS.

13. Even if Myers had manufactured and delivered grinder pumps with no defects, the grinder pump pressure collection system at Bellevue as late as May, 1983, did not operate properly because of PMS's

---

**17.** The Court need not reach the issue of whether or not there are any damages for delay in delivery attributable to Mechem inasmuch as Mechem is not a party to this litigation.

**18.** Because the record does not reflect the exact date of the Myers-PMS agreement, it is impossible to determine the exact length of time between the December agreement and the January delivery.

failure to properly wire the pump controls in the junction box.[19]

14. In proving damages, PMS introduced evidence of total additional expenses incurred due to "delay in shipment, defective product, discovery of defects, correction of the defects, increased working time due to adverse weather conditions, additional material expense, additional equipment expense, additional clean-up time ... was $15,860.15." (D.I. 21 at 17–18.) While a portion of this expense may be attributable to Myers due to the defective check valves, a substantial amount of this expense is the direct result of factors other than the defective check valves.[20]

15. Because this Court can find no reasonable basis in the record for allocation of expenses, it is, therefore, proper that the Court reject the entire claim for defective materials supplied and late performance. (*See Lichter v. Mellon-Stuart Co.*, 305 F.2d at 220.)

16. In order for Myers to warrant and guarantee the materials supplied in the contract, Myers must be convinced that the equipment, as installed, will function properly. (Tr–B at 8.) Due to the electrical problems related to the junction box, Myers refused to guarantee that the system would function properly. (*Id.*)

17. Absent proof by PMS that this condition precedent to Myers' warranty was wrongful under the agreement, the Court finds this argument by PMS to be without merit.

18. Finding that the plaintiff, Myers, has established that: (1) PMS contracted to purchase materials from Myers in connection with the contract between PMS and the State of Delaware for the Bellevue State project; (2) Myers delivered the materials pursuant to the agreement at a total price of $31,868; and (3) PMS has refused to pay the contract price after demand from Myers, a judgment will be entered against PMS as principal and Transamerica Insurance Company as surety, jointly and severally, in the amount of $31,-868.

19. The next items sought by Myers are prejudgment and postjudgment interest and costs on the amount owed, $31,868. Because this is a diversity suit on a contract, the law of the forum state, Delaware, relating to prejudgment interest applies in the absence of a rate set by the agreement between the parties. Under Delaware law, prejudgment or moratory interest has been permitted as part of the damages in cases which involved a breach of contract. *Rollins Environmental Services, Inc. v. WSMW Industries, Inc.*, 426 A.2d 1363 (Del.Super.1980); *E.M. Fleischmann Lumber Corp. v. Resources Corp. International*, 114 F.Supp. 843 (D.Del. 1953); *Superior Tube Co. v. Delaware Aircraft Industries*, 60 F.Supp. 573 (D.Del. 1945).

20. The legal rate of interest is set in 6 *Del.C.* § 2301(a), as amended on April 23, 1980 (Senate Bill 519), which provides in relevant part:

(a) Any lender may charge and collect from a borrower interest at any rate agreed upon in writing not in excess of 5% over the Federal Reserve discount rate including any surcharge thereon, and judgments entered after May 13, 1980, shall bear interest at the rate in the contract sued upon. Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due; provided, that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time.

21. PMS breached its agreement with Myers when PMS failed to pay for the equipment manufactured by Myers, there-

---

**19.** Because the resolution of the controversy hinges on the issue of causation, the Court need not reach the remaining issues concerning the tender of conforming goods or acceptance by PMS.

**20.** Those factors include PMS's failure to fully staff the construction crews and its failure to properly wire the junction boxes.

fore, this Court finds that an award of prejudgment interest is warranted.

22. There is, however, some confusion as to the date from which prejudgment interest runs. Myers contends, without stating any reasons, that it is entitled to prejudgment interest from February 4, 1983. (D.I. 22 at 14.) It is clear from the record that although Myers delivered the equipment on January 4, 1983, Myers was still involved in replacing check valves and installing redundant check valves on the equipment "even after Memorial Day" of 1983. (Tr–B at 13.)

23. Because Myers failed to establish the date after Memorial Day, 1983, that the work on the check valves and redundant check valves was completed, it is impossible for this Court to determine exactly when the breach occurred. As a result, the Court, in the exercise of its discretion, has chosen the date the complaint was filed, the next date following Memorial Day, 1983, upon which the work of Myers certainly had been completed.

24. Prejudgment interest, therefore, shall run on the sum of $31,868, at the rate stated in 6 *Del.C.* § 2301(a) from October 28, 1983, to the date that judgment is entered.

25. Postjudgment interest will be awarded from the date of the entry of the judgment in accordance with 28 U.S.C. § 1961 (1982).

26. Judgment will be entered in accordance with the above findings of facts and conclusions of law.