**Daniel MILLER, Plaintiff,**

v.

**NEWSWEEK, INC., Defendant.**

**Civ. A. No. 85–500–JLL.**

United States District Court,
D. Delaware.

Dec. 7, 1987.

Richard R. Wier, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiff.

Phebe S. Young of Bayard, Handelman & Murdoch, P.A., Wilmington, Del., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

This civil action was filed by plaintiff Daniel Miller, a professional photographer, seeking $108,000 in damages from defendant Newsweek, Inc., for defendant's alleged loss of 72 photographic negatives sent by Miller to Newsweek (Docket Item ["D.I."] 1.) Miller's complaint consisted of two counts, a breach of contract claim and a tort claim for negligent breach of duty as a bailee. (*Id.*) The parties filed cross motions for summary judgment. (D.I. 37; 41.)

After a hearing on the summary judgment motions, this Court dismissed Miller's breach of contract claim. *Miller v. Newsweek, Inc.,* 660 F.Supp. 852, 858 (D.Del. 1987). However, the Court granted Miller's motion for summary judgment as to his tort claim, finding that Newsweek's loss of the photos was a breach of its duty as a bailee. *Id.* at 860. The Court denied both parties' motions for summary judgment as to damages, finding that a question of material fact existed with regard to that issue. *Id.*

A non-jury trial was held on October 5–6, 1987, to determine the appropriate amount of damages. After carefully considering the sufficiency and weight of the testimony adduced at trial, the demeanor and credibility of the witnesses who testified, the exhibits admitted into evidence, and the post-trial submissions of the parties, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

1. In early August, 1982, the New York Times ("the Times") requested that Miller photograph Irving Shapiro, the former Chairman of the Board of the DuPont Company. (D.I. 58 at 23, 48.) The Times intended to publish an article on Shapiro's recent start of a new career as an attorney for a law firm. (*Id.* at 28.) Miller accepted the assignment and agreed to be paid on the basis of the time he would spend. The Times made arrangements for Miller to meet with Shapiro. (*Id.* at 23, 36, 37.)

2. Miller spent an hour and a half with Shapiro and shot 72 pictures. (*Id.* at 24, 25.) The New York Times paid Miller $200 for the session. (*Id.* at 36, 37.)

3. Miller testified that his session with Shapiro was somewhat unique as compared with a normal photograph session with a business executive. (*Id.* at 45, 59, 61.) The session was much longer than is usual, allowing Miller to be selective and deliberate in taking each photograph. (*Id.* at 9, 10, 29.) The length of the session also allowed Miller to develop a rapport with Shapiro. (*Id.* at 58.) The pictures were not posed; they were taken as Shapiro worked. (*Id.* at 24, 25.) The session also occurred at a time when Shapiro was beginning a new career. (*Id.* at 59.)

4. The Times ultimately did use one of the pictures for its article. (*Id.* at 25, 26, 48.) However, Miller retained the rights to all of the negatives. (*Id.* at 32.)

5. Shortly after the Times published one of the Shapiro pictures, Miller received a call from Newsweek. (D.I. 58 at 31.) Newsweek was considering an article on Shapiro and was interested in possibly using one or two of Miller's pictures. (*Id.* at 57.) Newsweek requested that Miller send all of the negatives for them to examine. (*Id.*) Miller had the Times return the negatives on August 27, 1982, and two days later sent the negatives to Newsweek.[1] (*Id.*)

---

1. The Court heard conflicting evidence as to when the negatives were requested and sent to Newsweek. Miller testified that Newsweek saw the Times article on Shapiro and called Miller within two or three weeks. (D.I. 58 at 31.) Miller said he then asked the Times to return his negatives and offered into evidence a document from the Times showing that the negatives were returned August 27, 1982. (PX 1.) However, two letters sent to Newsweek by Miller indicated that the photos were sent to Newsweek in September, 1983. (DX 1, 2.) Miller

6. Newsweek agreed to pay the standard space rate for any photograph that it used. (Defendant's Exhibit ["DX"] 1.) This space rate generally was $500 for one full page picture, $250 for half a page, and $125 for a quarter of a page. (D.I. 58 at 38.) These are the rates for a single use of a picture; the photographer retains all rights to the negative.

7. The seventy-two negatives Miller sent to Newsweek were never returned to him by Newsweek. (*Id.* at 31.)

8. The normal time period for a user to hold a photographer's negatives is three weeks. (*Id.* at 93.)

9. The plaintiff Miller established that he was an experienced photographer. Miller had been a photo editor at the Philadelphia Inquirer, a staff photographer for two newspapers, and a professional free-lance photographer. (*Id.* at 3–7.) As a free-lance photographer, Miller regularly shot pictures for the Times, the Philadelphia Inquirer, Time Magazine, and other publications. (*Id.* at 6.) Miller's pictures have been published as well in Europe, Asia and South America. (*Id.*) Miller often shot pictures of business executives for the business section of the Times in addition to other publications, such as Business Week. (*Id.* at 8, 44.) Pictures taken by Miller have also appeared in textbooks. (*Id.* at 55.)

10. Of the seventy-two photographs, the Court finds that sixty-five were of publishable quality. The Court finds plaintiff's expert's testimony creditable that in this case 10% of the photographs would be likely to have a flaw. (D.I. 58 at 82, 83.) Defendant's expert also testified that as a photographer and as a photo editor he had never seen an entire take where every negative was publishable. (DX 3 at 63.)

11. Miller retained the copyrights to all seventy-two negatives. (*Id.* at 32.) It is undisputed that the copyright for a photograph is the photographer's lifetime plus fifty years. (*Id.*)

12. The Court finds that the sixty-five publishable pictures have no clearly ascertainable market value. The plaintiff has argued that the market value for each of the sixty-five negatives is $1500. (D.I. 60 at 2; D.I. 58 at 32, 35, 75, 76.) The $1500 figure apparently was derived from a survey of publishers, advertisers, and others who use photographs commercially ("users"). (D.I. 58 at 73–75.) The survey was performed by the American Society of Magazine Photographers. (*Id.* at 73.) The primary purpose of the survey was to arrive at an average value for insurance purposes for photographs held by users. (*Id.* at 76–77.)

■ Such a survey is not necessarily an accurate reflection of the market value of each of the photographs at issue here. The market value of an item is determined by what a reasonable buyer would pay for the item in a normal transaction. The survey is not an accurate representation of that value for several reasons. First of all, estimating a value for insurance purposes may yield a very different result from determining the amount which one would actually pay for a picture. Secondly, the survey does not differentiate between pictures on the basis of quality or the prestige of the photographer. The demand for the particular subject of the picture also varies, which could yield vastly different values. (DX 3 at 67.) Additionally, the number of shots taken of a given subject matter may impact the value of each picture. Finally, a photographer's agent will generally only send a few of the best photographs of a given take to a user. (DX 3 at 67–68.) Consequently, users typically handle the highest quality photographs, which would be likely to have a higher earning potential than other photographs in a take. In sum, as defendant's expert noted, the $1500 figure is essentially an arbitrary number. (DX 3 at 30–31, 50.)

The difficulty of valuing a negative is that the entire copyright for a picture is usually not sold. (DX 3 at 24–26, 36–47;

---

testified that the September, 1983 date was derived from a mistake in his records. The Court finds Miller's testimony on this issue to be credi-

ble, and concludes that negatives were sent to Newsweek by messenger on August 29, 1982.

D.I. 58 at 37, 38.) Generally a publication will simply buy the right to use a picture for a certain article, and the photographer will retain all other rights to the picture. (DX 3 at 24–26; D.I. 58 at 32, 37, 38.) Indeed, plaintiff has failed to offer any examples of selling the copyright of one of his pictures to a third party. Only one example was given by the plaintiff of anyone else selling full rights to a photograph. (D.I. 58 at 92.) That situation, involving the U.S. Postal Service's procurement of a picture for use as a logo, appeared to be quite unique. (*Id.*) Defendant's expert knew of only two occasions in which a photographer sold the copyright to a picture; in both cases, the price was substantially less than $1500 per picture. (DX 3 at 24–26.)

13. Generally, then, the value of a picture is reflected in the number of times it will be leased to users, the type of users who will lease it, and the size of the picture that ultimately is published. (DX 3 at 9–16; D.I. 58 at 37–40, 83–93.) Plaintiff has failed to sustain his burden of proof on the issue of demonstrating that the sixty-five lost publishable negatives are worth $1500 each.

An expert witness for the plaintiff testified that her analysis of sales histories of images that had repeated sales showed that $1500 was a conservative estimate of their value. (D.I. 58 at 75.) However, the negatives at issue here were not shown to have a history of repeated sales. It also was not shown that any of the lost negatives were likely to have repeated sales.

Plaintiff's expert did testify regarding the possible uses for the pictures. (*Id.* at 83–91.) The expert testified that of the total photographs in use, only about 12% were used by periodicals and newspapers. (*Id.* at 84.) Roughly another 25% of the photographs in use were used in advertising. (*Id.*) The remaining market for photographs, comprising over 60% of the total uses, was for textbooks, reference books, posters, and other educational materials. (*Id.* at 85.) While such testimony gives an indication of the broad spectrum of uses for photographs, it does not show that a picture taken for and used by a newspaper will find twice as many uses in advertising and five times as many uses in textbooks. The numbers given by the expert only reflect the rough proportions of the types of submarkets for commercial photography. They do not indicate how frequently photographs originally taken to fill one sub-market are later used to fill demands in a different sub-market.[2]

There were two other problems related to this testimony. First, the plaintiff's expert gave no indication of how much money is earned by a photographer when his picture is used in a textbook. (*Id.* at 88.) Second, before Miller could use any of the pictures of Shapiro for advertising, he admittedly would have to get Shapiro's permission. (*Id.* at 38, 39.) There was little indication whether Shapiro would freely give such permission.

Plaintiff's expert did testify that she thought that each of the negatives had a value of $1500. (*Id.* at 83.) One of defendant's experts estimated that all seventy-two pictures that were shot would probably earn a total of between $2000 and $20,000. (DX 3 at 27–31.) The Court finds that the plaintiff has not sustained his burden of proof in showing that a reasonable estimate of the publishable photographs' earning potential would be $1500 each or $97,500 total. Using the half-page rate given by the plaintiff, Miller's sixty-five publishable photographs would have to be used in a total of nearly 400 stories in order for them to earn $97,500. The Court finds that there is not sufficient evidence to indicate that the demand for the photographs would be that strong. One of defendant's experts searched through various indices covering 3000 publications and found that of the over 200 articles discussing Irving Shapiro since September, 1982, only fourteen used pictures of Shapiro. (D.I. 58 at 111–18; DX 4.) Plaintiff offered ten articles on Shapiro with pictures not uncovered by defendant's searches, bringing the total to

---

2. The expert's testimony is also undermined by the fact that the original percentages given by the expert—12½%, 25% and 67½%, respectively —add up to 105%.

only twenty-four. (D.I. 58 at 131–32; Plaintiff's Exhibit ["PX"] 2.) Plaintiff did demonstrate that the pictures would be likely to have uses other than just articles covering Shapiro. (D.I. 58 at 85–91.) For instance, the pictures might be used to illustrate a more general article regarding lifestyles or management styles of a prominent businessman. (*Id.* at 87.) However, there is no evidence to indicate that such alternate uses would number in the hundreds. The Court finds that a reasonable estimate is that each of the publishable photographs would be used once at the half-page rate ($250). The total value of the sixty-five publishable pictures would therefore be $16,250.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction in this case by virtue of the diversity jurisdiction provision of 28 U.S.C. § 1332 (Supp.1987), as both parties are citizens of different states and the amount in controversy exceeds $10,000. (D.I. 1 at ¶¶ 1–3.)

2. Delaware law applies in this case for reasons discussed in this Court's previous opinion. *Miller,* 660 F.Supp. at 854–55.

3. The Court previously concluded that Newsweek is liable for the loss of all of Miller's negatives. *Id.* at 860.

■ 4. There are no Delaware cases which discuss the valuation of lost photographs. Generally, one who is entitled to damages for the destruction of a legally protected interest in property may recover the value usually paid in the market or the value obtained in the normal course of finding a purchaser. Restatement (Second) of Torts §§ 911, 927 (1979). Alternatively, the value of the property to the owner may also be recovered. *Id.* Where there is no clear-cut market value, as in this case, courts in cases involving lost pictures or paintings have looked to the cost of replacement or the value of the lost property to the owner. *Mieske v. Bartell Drug Co.,* 92 Wash.2d 40, 593 P.2d 1308 (1979); *Szekely v. Eagle Lion Films,* 140 F.Supp. 843 (S.D.N.Y.1956); *Sarkesian v. Cedric Chase Photographic Laboratories, Inc.,* 324 Mass. 620, 87 N.E.2d 745 (1949); *Cher-*

*ry v. McCutchen,* 16 S.E.2d 167 (Ga.1941). Awarding Miller the cost of replacing the pictures is an unsatisfactory remedy for two reasons: (1) such a remedy would not compensate Miller for the income he has lost over the past five years by not having the pictures, and (2) Miller's session with Shapiro was unique in several ways and would be difficult to duplicate exactly. (D.I. 58 at 45, 59, 61.) Consequently, the Court finds that the correct measure of damages is the value of the photographs to Miller.

■ 5. In valuing commercial photographs courts have examined factors such as: (1) uniqueness of the subject matter; (2) prestige of the photographer; (3) established use prices; (4) technical quality. *Rattner v. GEO Magazine,* N.Y.L.J. March 16, 1987, at 39, col. 2 (N.Y.Sup.Ct.); *Hoffman v. Portogallo,* C.A. 19102–85 (N.Y. Sup.Ct. June 20, 1987). Under Delaware law, the fact that there is some uncertainty as to the proper amount of damages or that the amount is difficult to measure will not preclude the trier of fact from determining the value of damages. *Henne v. Balick,* 146 A.2d 394, 396 (Del.1958). Considering all the evidence relating to the above named factors, the Court finds that the reasonable and fair value to Miller for the lost photographs is $16,250.

■ 6. Plaintiff also requests holding fees of five dollars per image per week dating from September, 1982. (D.I. 60 at 2.) Plaintiff argues that such holding fees are standard in the industry. (D.I. 58 at 92, 93.) The Court's grant of damages to the plaintiff compensates him for the loss of use of the photographs. The holding fee is also designed to compensate a photographer for loss of use of the photographs. To grant both would award the plaintiff a double recovery. Consequently, the Court will not award duplicate damages for holding fees.

■ 7. Under Delaware law, prejudgment interest will be granted on a damage award in certain tort cases. *Metropolitan Mut. Fire Ins. Co. v. Carmen Holding Co.,* 220 A.2d 778 (Del.1966); *E.M. Fleisch-*

mann Lumber Corp. v. Resources Corp. Inter., 114 F.Supp. 843 (D.Del.1953); Superior Tube Co. v. Delaware Aircraft Industries, 60 F.Supp. 573 (D.Del.1945). The court in *Superior Tube* performed an extensive review of the prejudgment interest issue in Delaware case law dating back to the late 19th Century. *Superior Tube*, 60 F.Supp. at 574–75. The court noted that prejudgment interest was given in tort cases where the injury consisted of depriving an owner of property having definite or ascertainable value. *Id.* at 575, n. 3; *see, e.g., H.J. Keith Co. v. Booth Fisheries*, 87 A. 715 (Del.Super.1913) (in a bailment case, owner of property damaged by negligence of warehousemen may recover interest on the damage award). Interest was not given in cases involving wrongs such as defamation, personal injury, etc. *Superior Tube*, 60 F.Supp. at 575, n. 3. The court's holding in *Superior Tube* was adopted by the Delaware Supreme Court in *Metropolitan Mutual Fire*, 220 A.2d at 781. The Court concludes that because this case involves loss of property with a reasonably ascertainable value, an award of prejudgment interest dating from September 19, 1982 (the approximate end of the normal holding period), is appropriate.

8. Prejudgment interest shall be awarded by the Court at 5% over the Federal Reserve discount rate as of September 19, 1982, to the date that final judgment is entered herein in accordance with 6 *Del.C.* § 2301 (Supp.1986). *F.E. Myers Co. v. Pipe Maintenance Services, Inc.*, 599 F.Supp. 697, 704 (D.Del.1984). Post-judgment interest shall be awarded by the Court and calculated from the date of entry of the judgment entered herein until paid, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment, in accordance with 28 U.S.C. § 1961. *Schumann v. Levi*, 728 F.2d 1141, 1143 (8th Cir.1984); *F.E. Meyers Co. v. Pipe Maintenance Services, Inc.*, 599 F.Supp. at 705.

9. The Court therefore concludes based on the credible evidence that the plaintiff Miller is entitled to damages in the amount of $16,250 for the publishable negatives owned by Miller that were lost by Newsweek, together with prejudgment interest computed in accordance with 6 *Del.C.* § 2301 from September 19, 1982, to date of entry of judgment herein and with post-judgment interest computed from date of entry of the judgment herein until paid computed in accordance with 28 U.S.C. § 1961.

An order will be entered in accordance with these findings of fact and conclusions of law.