Frank BALCAR, Plaintiff,

v.

AIRCRAFTERS, INCORPORATED, a Delaware Corporation, Defendant.

Superior Court of Delaware,
New Castle County.

Submitted Jan. 13, 1976.

Decided June 30, 1976.

Michael R. Shapiro, of O'Donnell & Hughes, Wilmington, for plaintiff.

Wayne N. Elliott, of Prickett, Ward, Burt & Sanders, Wilmington, for defendant.

TAYLOR, Judge.

This case was heard without jury. Therefore, this opinion contains the Court's factual findings as well as conclusions of law.

Plaintiff's airplane was damaged while at defendant's airport near Rehoboth during a severe thunderstorm on the evening of July 4, 1970. Plaintiff had landed at the airport on July 2 or 3, 1970 and he had secured the airplane to moorings installed at the airport and had used tie-down ropes furnished by the airport. He placed the airplane at its location and tied it in place. He had not moved the airplane since he placed it there.

In the late afternoon of July 4, when he was driving in the vicinity and it appeared that a thunderstorm was imminent, he stopped at the airport and checked to see that the ropes were tight. Shortly thereafter, the storm hit the area and plaintiff's airplane was moved by the wind about 200 feet and came to rest on top of another airplane. The only other airplane which was moved by the storm was an airplane in the same line with plaintiff's airplane. Near the airport, and in direct line with the airport, the wind broke tops of trees in a fifty-foot path.

The airplane had been secured by ropes which were tied to rings which were permanently fastened to the airplane, one ring at the tail of the airplane, and one ring at each wing strut. Each rope was tied at the ground end to an eye fastened in the ground. When the airplane was examined after the storm, the rope tied to the tail ring had been broken six or seven inches from the ring, and the rope tied to the starboard strut ring also had been broken. The rope tied to the port strut ring had not broken. A sisal rope was tied to the port ground eye, and it extended in the

direction the airplane had moved. This rope did not appear to have broken.

Plaintiff charges defendant with negligence in several respects discussed hereafter.

Turning to the extent of defendant's duty, defendant provided open space for the pilots to store their airplanes and provided tie-down ropes and ground fastenings, commonly called "tie-down facilities". For this, plaintiff paid $2 or $3 per day. Defendant did not place the airplane or undertake to secure it or check its fastenings, since at this airport these were done by the airplane pilot. Thus, if defendant is to be held liable, it must rest upon the failure of defendant to provide proper tie-down facilities.

Plaintiff contends that the liability for storage of his airplane is governed by the law of bailment, under which there is a presumption that if the bailee had taken due care of the object nothing would have happened to it. 8 *AmJur.2d*, Bailments § 67, p. 972. Where a bailment exists and the item which was in good condition upon delivery to the bailee is not returned in the same condition, the presumption of negligence arises which defendant must rebut. 43 *A.L.R.3d* 607 et seq.; 44 *A.L.R.3d* 862.

This rule rests upon the realities arising from the transfer of possession and control of the items to the bailee. 8 *Am. Jur.2d,* Bailments § 67, p. 972. The facts in this case are that defendant indicated the area in which plaintiff was to leave his plane, and defendant provided the tie-down fastenings and ropes. Plaintiff placed the plane at its mooring location, tied the ropes to the plane, locked the plane and kept the key. Defendant did not undertake to care for or provide protection for the plane other than that afforded by the fastenings and ropes. This arrangement between plane owner and airport has been held not to constitute a bailment. *Hoffman v. King Resources Co.,* Colo.Supr., 530 P.2d 961

(1975); *Simons v. First National Bank of Denver,* 30 Colo.App. 260, 491 P.2d 602 (1971).

In support of its contention that a bailment relationship exists here, plaintiff has cited *Zanker v. Cedar Flying Service, Inc.,* 214 Minn. 242, 7 N.W.2d 775 (1943) and *Alamo Airways, Inc. v. Benum,* 78 Nev. 384, 374 P.2d 684 (1962). In both of these cases, the airport operator took possession of and placed the plane in storage. The remaining case relied on by plaintiff is *Meyer v. Moore,* Okl.Supr., 329 P.2d 676 (1958) in which the Court found without discussing the applicable principles that a bailment existed and held that the airport operator had a duty to use ordinary care in safeguarding the plane. I conclude that plaintiff here did not transfer possession of the plane to defendant and hence a bailment was not created. *Mayer v. Sampson,* 157 Colo. 278, 402 P.2d 185 (1965); *Lewallen v. Board of Levee Commissioners,* La.App., 166 So.2d 566 (1964).

The applicable test here is whether defendant satisfied its duty to plaintiff with respect to the fastenings and ropes which it furnished for plaintiff to tie down his airplane. The ground fastenings did not fail. The rope system did fail. The applicable standard is that of reasonable care. Did the airport operator use reasonable care in supplying and maintaining the ropes which it provided, taking into consideration the usage to be made of the ropes? *Hoffman v. King Resources Company,* supra; *Simons v. First National Bank of Denver,* supra; *Meyer v. Moore,* supra; *Quam v. Nelson-Ryan Flight Service,* 274 Minn. 475, 144 N.W.2d 551 (1966); *Central Aviation Co. v. Perkinson,* 269 Ala. 197, 112 So.2d 326 (1959).

Whether negligence existed here must be inferred from the circumstances since there is no direct evidence of negligence. Plaintiff's contention is that the damage was caused by the separation of the port tie-down ropes. No contention is made

that the other two tie-down ropes were inadequate. It does not appear that the port 'tie-down rope broke. It does appear that the port tie-down was not a single continuous rope. One supposition is that the rope which remained attached to the plane was spliced or tied to another rope and that one portion was nylon and the other portion was sisal, causing the splice or knot to slip. An alternate supposition is that one rope had been tied through a knot in another rope. Another alternate supposition is that the rope had been spliced to a short rope at the ground tie-down. It has not been shown that any of these alternate fastenings is improper per se.

■ Defendant had a duty to provide tie-down ropes which would withstand wind forces which could reasonably be anticipated. *Alamo Airways, Inc. v. Benum,* supra; *Hoffman v. King Resources Company,* supra. This test, of course, applies to fastenings, knots, splices, as well as to continuous pieces of rope.

The immediate conclusion would be that where there was no force or causation other than wind, the failure of the tie-down system by separation of the ropes indicates that defendant did not meet its duty to plaintiff. This conclusion would seem to be strengthened by the fact that all of the planes tied at the airport remained in place with the exception of plaintiff's plane and one other plane.

There is no doubt that this storm was of unusual severity. The question is whether its severity was so great that a person would not reasonably have anticipated that degree of severity in securing a plane. Such a condition is commonly referred to as an act of God.

The evidence indicates that a severe storm of near hurricane force swept the area and that a path about 50 feet wide was hit by extremely high wind—so high that tops of trees in its path were broken. According to a meteorologist the cloud tops of this storm extended to 55,000 feet, which is indicative of wind velocities of 90–100 miles per hour. No such velocities had occurred in the area over the previous 5 years. Defendant's expert conservatively estimated that the wind gusts were in the neighborhood of 45 to 65 miles per hour. These estimates were based on recordings at Wildwood, New Jersey, Dover Air Force Base, Salisbury, Maryland and Ocean City, Maryland, and cooperative observer reports from Georgetown, Selbyville, Milford and Lewes, Delaware.

An eyewitness testified to the intensity of the storm at the airport, who had returned to check on his own plane as the storm approached. He likened the sound of the wind at the height of the storm to that which he had heard during a typhoon while serving on a Navy destroyer in 1944 when the wind velocity ranged between 90 and 100 miles per hour. In the storm at the airport, the wind reached this stage for only 10 to 20 seconds. While this is devoid of scientific accuracy, it is entitled to some weight in considering the extent of the wind velocity which developed during the storm.

Defendant further supports its contention that this was a storm of unusual and unforeseen intensity by the fact that the storm brought water of two inches' depth into the airport office. Over several years of operation of the airport by defendant there had never been such an occurrence previously.

Plaintiff cites cases which have held that high wind does not relieve the airport of liability for tie-down failure. This result was reached in *Alamo Airways, Inc. v. Benum,* supra, where the wind speed was 41 knots, and *Central Aviation Co. v. Perkinson,* supra, where the wind speed was 35 miles per hour. As noted above, the wind speed here probably reached 65 miles per hour and may have momentarily reached the 90–100 mile per hour range. *Olan Mills, Inc. v. Cannon Aircraft Ex. Term.,* 273 N.C. 519, 160 S.E.2d 735 (1968), and *Shephard v. Graham Bell*

*Aviation Service, Inc.,* 56 N.M. 293, 243 P.2d 603 (1952), held that wind gusts of up to 90 miles per hour did not relieve an airport from liability for tie-down failure.

The test of liability is whether the wind force on this occasion was a common and well-known hazard, *Hoffman v. King Resources Company,* supra, or whether this natural phenomenon was so far outside the range of human experience or was such a rare occurrence that ordinary care did not require that it should be anticipated. *Olan Mills, Inc. of Tennessee v. Cannon Aircraft Executive Terminal, Inc.,* supra.

Recognizing the proximity of this airport to the Atlantic Ocean and Rehoboth Bay and the likelihood of severe thunderstorms in the summer, I do not find that defendant is exonerated from providing tie-down ropes of sufficient strength to withstand this wind.

From the evidence presented, I conclude that under the relationship existing between plaintiff and defendant and based upon the practice existing between airplane pilots and airports where this type of arrangement exists, the airport did not undertake or have a duty to check the manner in which plaintiff's airplane was tied down, that it did not undertake or have a duty to maintain an attendant to check on the safety of plaintiff's airplane or to protect it from the elements.

A second defense is that the port tie-down contained ample rope to fasten plaintiff's airplane without using the spliced portion. Since the actual tying to the plane was made by plaintiff, defendant asserts that plaintiff elected to use the spliced portion of the rope rather than use the portion which was continuous, and be-

cause of this election, plaintiff cannot hold defendant liable since plaintiff was contributorily negligent in using the knotted or spliced portion instead of the continuous portion of the rope. It is clear that the ropes were readily visible and could easily be examined. In fact, the physical arrangement was such it does not appear that one could have performed the tie-down operation without becoming aware of the fact that one portion of the rope was spliced and that there was another portion of the rope that was continuous. It is not contended that this rope was inadequate to hold the plane or that it was defective other than at the splice.

Another application of this concept is plaintiff's action or inaction immediately in advance of the storm when it was apparent that a severe storm was approaching. The excess length of the port tie-down rope was sufficient to permit it to be used as a second or companion tie-down along with the spliced rope. Plaintiff went to his plane at that time and checked the tightness of the ropes, but took no action to use the extra length of the port tie-down rope.[1] Moreover, he did not place chocks at the wheels of the plane which would have reduced the strain on the ropes from lateral involvement of the plane in the wind.

In view of the action and inaction of plaintiff which I have just described, I conclude that under the relationship existing between plaintiff and defendant, plaintiff is barred from recovery. *Bib v. Merlonghi,* Del.Supr., 252 A.2d 548 (1969); *Dammer v. Metropolitan Merchandise Mart, Inc.,* Del.Supr., 217 A.2d 688 (1966); *Franklin v. Salminen,* Del.Supr., 222 A.2d 261 (1966).

Upon the foregoing findings, IT IS ORDERED that judgment is entered in favor of defendant.

1. It appears that plaintiff also had his own ropes in his plane which could have been used to supplement the tie down.