Daniel MILLER, Plaintiff,

v.

NEWSWEEK, INC., Defendant.

Civ. A. No. 85–500–JLL.

United States District Court,
D. Delaware.

May 20, 1987.

Richard R. Wier, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiff.

Phebe S. Young of Bayard, Handelman & Murdoch, P.A., Wilmington, Del., for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

Plaintiff Daniel Miller ("Miller"), a commercial photographer, instituted this action against defendant Newsweek, Inc. ("Newsweek"), seeking $108,000 in damages for the alleged loss of 72 photographic negatives sent by Miller to Newsweek. (Docket Item ["D.I."] 1.) Miller's complaint consists of two counts. Count One is a breach of contract claim, alleging that Newsweek breached its contract with Miller by failing to return the negatives. (*Id.* at ¶¶ 1–6.) Count Two sounds in tort, and asserts that Newsweek negligently breached its duty as a bailee by losing the negatives. (*Id.* at ¶¶ 1–11.) Newsweek filed an answer denying liability under both theories. (D.I. 16.) Jurisdiction in this Court is proper under the diversity jurisdiction provision of 28 U.S.C. § 1332 (supp.1987), since the parties are citizens of different states and the amount in controversy exceeds $10,000. (D.I. 1 at ¶¶ 1–3.)

Presently before this Court are the parties' cross motions for summary judgment. (D.I. 37; 41.) Miller requests a judgment on both counts of his complaint and Newsweek seeks dismissal of both counts. (D.I. 38; 42.) For the reasons stated in this Memorandum Opinion, the Court will take the following action: (1) grant Newsweek's motion for summary judgment as to Count One of Miller's complaint, deny Miller's motion as to that count, and dismiss Count One of the complaint; (2) grant Miller's motion for summary judgment as to the liability issue of Count Two of his complaint, and deny Newsweek's motion as to Count Two; (3) deny both parties' motions for summary judgment as to the damages issue of Count Two since a genuine issue of material fact exists with regard to that issue.

### II. FACTUAL BACKGROUND

The facts of this case are straightforward and to a great extent not disputed.

In August of 1982, Miller was asked by the New York Times ("the Times") to photograph Irving Shapiro ("Shapiro"), the former chairman of the Board of the DuPont Company. (D.I. 30 at 15.) Shapiro had recently resigned from DuPont and embarked on a career as a corporate attorney. (*Id.*) The Times planned to run an article with photos of Shapiro at work in his new career. (*Id.*) Miller accepted the Times assignment and took 72 black and white photos of Shapiro at his law office. (*Id.*) The Times used one of the photos in its article (*id.* at 22), but all of the photos remained Miller's property. (*Id.*)

Sometime after the Times' article, Newsweek also decided to do a story on Shapiro and needed to obtain photos to illustrate the story. (D.I. 31 at 11–12; 32 at 16; 33 at 8–9.) After seeing the Shapiro photo in the Times, Newsweek's photo researcher, F. Joseph Dwyer ("Dwyer"), contacted Miller in an attempt to acquire a Shapiro photo. (D.I. 31 at 11–12; 32 at 16; 33 at 8.)

Dwyer telephoned Miller at his Delaware residence and requested that he send all of his Shapiro negatives to Newsweek so its photo editors could have the "luxury of

editing it" themselves. (D.I. 30 at 46; 32 at 17–18.) Miller responded favorably to Newsweek's request, and the parties agreed that Newsweek would send a courier to Delaware to pick up the negatives. (D.I. 30 at 46; 32 at 18.) The parties further agreed that Newsweek would pay Miller the space rate for any photos it used in its article. (D.I. 30 at 46.) Newsweek dispatched a courier to pick up the negatives and the negatives arrived safely at Newsweek's New York office. (D.I. 32 at 18; 33 at 4–9.)

For reasons unrelated to this litigation, Newsweek decided not to run the Shapiro story, and Miller's photos were never used. (D.I. 33 at 6–9.) The 72 Shapiro negatives were never returned to Miller. (D.I. 30 at 50–59.) Newsweek still cannot find the negatives and they are presumed lost. (D.I. 30 at 58–59; 31 at 9–10; 32 at 10–14.)

Miller maintains that he sent a document known as a Delivery Memo to Newsweek along with the Shapiro negatives. (D.I. 30 at 49.) Although Newsweek's employees cannot recall one way or the other whether they received Miller's Delivery Memo, they admit that such memos are common in the photojournalism industry and that it is normal for photographers to include Delivery Memos when sending negatives. (D.I. 32 at 30; 33 at 20.)

The Delivery Memo used by Miller contains numerous provisions which purport to form the terms and conditions of a contract. (D.I. 1 at attachment.) The two provisions relevant for our purposes state:

1. Negatives and transparencies (hereafter "photographs") may be held for fourteen (14) days approval. Unless a longer period of time is requested and granted by DAN MILLER (hereinafter "DM"), in writing, a late fee of FIVE DOLLARS ($5.00) per week per transparency or negative and ONE DOLLAR ($1.00) per week per black and white positive print will be charged after such 14–day period and up to the time of return.

\* \* \* \* \* \*

4. The monetary damage for loss or damage of an original transparency or negative shall be determined by the value of each individual photograph. Recipient agrees, however, that the reasonable minimum value of such lost or damaged photograph shall be no less than FIFTEEN HUNDRED ($1500) DOLLARS. DM agrees to the delivery of the goods herein only upon the express covenant and understanding by Recipient ... that the terms contained in this Paragraph "4" are material to this agreement. Recipient assumes full liability for its employees, agents, assigns, messengers and freelance researchers for the loss, damage or misuse of the photographs.

(*Id.*)

There is no evidence that anyone at Newsweek ever read the memo, let alone signed or agreed to its terms. In fact, Dwyer claims never to have read any Delivery Memos. (D.I. 32 at 35.) This seems to be the general practice in the industry. (D.I. 46 at 2.)

## III. ANALYSIS

### A. Choice of Law

Before addressing the merits of the parties' cross motions, the Court must determine what substantive law to apply. Since jurisdiction in this Court is based on diversity, the Court must use the Delaware choice of law principles. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941).

Under Delaware choice of law principles, both counts of Miller's complaint must be decided under Delaware substantive law. Delaware law applies to the Count One contract claim because the contract was formed in Delaware. *Wilmington Trust Co. v. Pennsylvania Co.*, 172 A.2d 63, 66 (Del.Supr.1961); *Norse Petroleum A/S v. LVO Intern Inc.*, 389 A.2d 771, 773 (Del.Super.1978). A contract is formed at the moment the final act necessary for its creation takes place. *Norse Petroleum*, 389 A.2d at 773. The law of the place of this final act must thus govern. *Id.*

As the discussion below illustrates, this Court finds that the final act which created

the contract in the case at bar was Miller's acceptance on the telephone of Newsweek's offer to review the Shapiro negatives for possible publication. Since an acceptance is effective from the moment it is given, the contract was formed in Delaware, where Miller tendered that acceptance, and thus it is the law of Delaware which must govern. *Id.*

Delaware law also applies to Miller's tort claim. Delaware courts adhere to the traditional *lex loci delicti* rule and apply the substantive law of the place of the tort. *Friday v. Smoot*, 211 A.2d 594, 595 (Del.Supr.1955); *Lumb v. Cooper*, 266 A.2d 196, 197 (Del.Super.1970). The place of the tort for choice of law purposes is not where the negligent conduct which gave rise to the tort occurred, but where the last act necessary for tort liability, the injury, occurred. *Pack v. Beech Aircraft Corp.*, 132 A.2d 54, 56 (Del.Super.1957).

In traditional tort cases, the place of injury is where the plaintiff incurred physical harm. However, in this case the alleged injury was financial only, and the Court must therefore determine where Miller first incurred financial loss. Since Miller was a citizen of Delaware during all times relevant to this litigation (D.I. 30 at 2), the Court concludes that his financial loss occurred here in Delaware and will thus apply this state's substantive tort law.[1]

1. As will become apparent, the law on bailments upon which the plaintiff's tort claim rests is fairly uniform throughout the states. Thus the Court will rely on the general principles of bailment law as espoused by the Delaware courts and courts from other jurisdictions.

2. The Uniform Commercial Code has been adopted in Delaware, as in almost all other jurisdictions, and is codified at Del.Code Ann. tit. 6, §§ 1–101 to 11–109 (1975 & supp.1986).

3. Section 2–102 of the UCC states that "unless the context otherwise requires, this Article applies to transactions in goods." *Del.Code Ann.* tit. 6, § 2–102.

4. In *Harvey v. Sears Roebuck Co.*, 315 A.2d 599, 601 (Del.Super.1973), the Delaware Superior Court held that the phrase "transactions in goods" encompasses more than simply the sale

## B. Count One: The Delivery Memo

In Count One of the complaint, Miller contends that the Delivery Memo he sent to Newsweek along with the Shapiro negatives constitutes a valid contract and Newsweek is liable for the loss of those negatives under the liquidated damages and late penalty clauses of that contract. (D.I. 1 at ¶¶ 1–6.) In response Newsweek insists that the Delivery Memo has no legal significance and its terms are thus not enforceable against it. (D.I. 45 at 3–11.) The Court agrees with Newsweek.

A preliminary dispute between the parties centers on the applicability of Article II of the Uniform Commercial Code ("UCC")[2] to the transaction herein. Newsweek contends that if a contract does exist between the parties, it is a bailment contract, not a sales contract, and thus not within the scope of Article II. (D.I. 45 at 3–4.) Miller responds that Article II applies to all "transactions in goods,"[3] not just sales transactions, and is thus applicable to bailment contracts. (D.I. 47 at 14–15.)

The law on this issue is unclear. There are no reported decisions of the Delaware Supreme Court defining the scope of Article II, and the two Superior Court decisions which have addressed the issue do not resolve the question of Article II's applicability to bailment contracts.[4] Moreover, the courts of other jurisdictions disagree as to whether Article II applies to bailment contracts.[5]

of goods. Still, the Court never defined the limits of that phrase and refused to apply Article II to the loan transaction at issue in that case. *Id.* Then in *Martin v. Ryder Truck Rental Inc.*, 353 A.2d 581, 584 (Del.Super.1976), the Superior Court held that the warranty provisions of Article II do not manifest an intention of the Legislature to preempt the common law remedy of strict liability as to bailments and leases. The Court left unanswered the questions of whether those provisions could apply to bailments without preempting the common law remedy or if any other provisions of Article II apply to bailments.

5. *Compare Whitman v. Bell Telephone Co. of Pa.*, 522 A.2d 584 (Pa.Super.1987) ("neither leases or bailments are within the scope of Article II of the Code") *with Mieske v. Bartell Drug Co.*, 92 Wash.2d 40, 593 P.2d 1308 (1979) (Article II applies to Bailments).

When faced with no authoritative decisions of a state's highest court on an issue, a federal court applying that state's law must predict how that court would rule if presented with the issue. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981). In the present case, the Court need not apply this imprecise procedure since the Delivery Memo does not constitute a valid contract under either Article II or the common law and it is thus unnecessary to decide whether Article II applies to bailment contracts. This is the preferred result since defining the scope of Article II is clearly a chore best left for the Delaware courts.

Turning to the parties' contentions, Miller offers the following interpretation of the parties' dealings in support of his position that the Delivery Memo constitutes a valid contract. Miller maintains that the first contact between the parties, the Dwyer telephone call, was an invitation by Newsweek for Miller to submit an offer. (D.I. 47 at 9.) Miller's conduct in sending the Shapiro negatives, accompanied by the Delivery Memo, then constituted an offer to enter into a contract with the terms expressed in the Delivery Memo. (*Id.*) Newsweek's conduct in accepting the negatives, without objecting to the terms of the Delivery Memo, would then have constituted an acceptance of the contract and its terms under Section 2–204 of the UCC. (*Id.*)

The Court has a totally different view of the legal significance of the parties' contacts. The uncontroverted evidence demonstrates that a valid and enforceable contract was formed during the initial telephone conversation between Miller and Dwyer.

Miller's own deposition testimony suggests this result. Miller testified that Dwyer telephoned him and asked to review the Shapiro negatives for possible publication in a story that Newsweek was considering running on Shapiro. (D.I. 30 at 46.) Miller accepted this offer with an enthusiastic "why certainly." (*Id.*) The parties then set many of the important terms of the contract. The parties agreed as to the quantity of negatives, time, place, and manner of delivery, and even the price Newsweek would pay in the event it purchased the use of one or more negatives. (D.I. 30 at 46.)[6] The Court finds that this conversation manifested a clear and unambiguous intention on the part of both parties to enter into a binding agreement. Nothing more is required for a valid and enforceable contract to exist under Article II. *See Del.Code Ann.* tit. 6, § 2–204(1).

A valid and enforceable contract having been formed on the telephone, the Delivery Memo constituted a written confirmation of an existing contract under section 2–207 of the UCC. Section 2–207 applies in situations like the one herein where an oral agreement has been reached and one or both of the parties send written confirmation of that agreement including additional terms not previously discussed. Uniform Commercial Code, comment 1 to 2–207; *Leonard Pevar Co. v. Evans Products Co.*, 524 F.Supp. 546, 550 (D.Del.1981). The fact that the confirmation contains additional terms has no affect on the validity of the original acceptance. *Del.Code Ann.* tit. 6, 2–207(1). As between merchants,[7] the additional terms become part of the contract unless they materially alter it or the opposing party has previously objected to them or does so within a reasonable time. *Id.* at 2–207(2); *Evans Products Co.*, 524 F.Supp. at 550.

---

**6.** Miller's testimony is uncontroverted. Dwyer, the other party to the conversation, has little recollection of the exact words used. (D.I. 32 at 17–18.) He does recall that the parties agreed that Miller would send the negative of the Shapiro photo that appeared in the Times and any other negatives of Shapiro. (*Id.*) Dwyer also recalls dispatching a courier to Delaware to pick up the negatives pursuant to the parties' agreement. (*Id.*)

**7.** The UCC defines a merchant as one who deals in goods of the kind. *Del.Code Ann.* tit. 6, § 2–104. Assuming arguendo as the Court has, that the UCC applies to the transaction herein, the Court sees no reason why both parties should not be considered merchants since they deal in goods (photographs) of the kind.

Miller contends that the additional terms expressed in the Delivery Memo were incorporated into the contract under section 2–207 [8] since the terms do not materially alter the contract and Newsweek never objected to them. (D.I. 47 at 10–12.) Newsweek admits that it failed to object to the terms, but insists that the terms would materially alter the contract and thus were not incorporated into it. The Court agrees with Newsweek. [9]

The Delivery Memo contains numerous terms not contained in the original oral contract. (D.I. 1 at attachment; 30 at 46.) However, Miller's contract claim is based on the liquidated damages and late penalty clauses of the Delivery Memo only. Thus the Court will limit its discussion of section 2–207 to those clauses.

Neither the text of section 2–207 nor its comments expressly define the phrase "materially alter." Even so, some courts have inferred one possible test from the comments. [10] A term materially alters a contract if incorporation of that term would result in surprise or undue hardship to the party opposing the incorporation. *Product Components Inc. v. Regency Door and Hardware Inc.*, 568 F.Supp. 651, 654 (S.D. Ind.1983); *National Controls Inc. v. Commodore Business Machines Inc.*, 163 Cal. App.3d 688, 109 Cal.Rptr. 636 (1985).

Both the liquidated damages and late penalty clauses would result in surprise and undue hardship to Newsweek if incorporated into the oral contract. In forming the original agreement the parties never discussed any liquidated damages or late penalty provisions. (D.I. 30 at 46.) The

parties never focused on the possibility that the film might be returned late or not at all. (*Id.*) To include these terms in the contract simply because they appeared in a unilateral proposal offered by Miller would surely result in a surprise to Newsweek, especially considering that Newsweek's employees never read the Delivery Memo (D.I. 32 at 35), as was the common practice in the industry. (D.I. 46 at 2.)

Incorporating these two terms would also result in undue hardship to Newsweek. The contract contemplated that Newsweek would review the 72 negatives at no cost to it, with an option to purchase the use of one or more of those negatives for $100–$200. (D.I. 30 at 46.) It would be extremely unfair for this Court to impose a liquidated damages figure of $1500 per negative or a late penalty of $5.00 per negative per week on Newsweek when the contract clearly indicates that the negatives were only worth $100–$200 apiece to Newsweek. There is simply no evidence to suggest that Newsweek would have entered into a contract which exposed it to such severe penalties when the value of each negative to it was so low.

In sum, the Court finds that incorporation of the liquidated damages and late penalty clauses into the contract would materially alter the contract, and they must therefore be disregarded.

■ Miller's final argument in support of his Count One contract claim is based on the common law, not Article II of the UCC. Miller maintains that even if Article II is not applicable to the contract in issue, Newsweek's conduct in receiving the nega-

---

**8.** Miller does not concede the applicability of section 2–207. In his first argument Miller contends that section 2–207 does not apply to the transaction at issue since the the Delivery Memo was an offer by him and section 2–207 applies only to acceptances and written confirmations. (D.I. 47 at 9.) However, if the Court finds that section 2–207 applies, Miller offers an argument under section 2–207 in the alternative.

**9.** Additional terms cannot be incorporated into a contract unless the opposing party fails to object *and* they would not materially alter the contract. *Del.Code Ann.* tit. 6, § 2–207(2). Thus this Court's conclusion that the additional terms contained in the Delivery Memo would

materially alter the contract makes it unnecessary for it to consider Miller's argument regarding Newsweek's failure to object.

**10.** Comments 4 and 5 give examples of the types of additional terms which would and would not materially alter a contract. Both comments can be read as implying the test referred to above. Comment 4 begins: "Examples of typical clauses which would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party are...." Comment 5 contains the same language in reference to terms which would not materially alter the contract.

tives and accompanying Delivery Memo constituted an acceptance of Miller's counteroffer and the terms of the Delivery Memo. (D.I. 47 at 14.) This argument sounds all too familiar having been advanced by Miller earlier in reference to section 2–204 of the UCC. The Court rejected that argument under the UCC since a valid contract was formed during the telephone conversation between Miller and Dwyer and the Delivery Memo was not an offer or counteroffer by Miller but a written confirmation of the contract.

Under the common law, the result remains basically the same. The oral agreement reached on the telephone still constitutes a binding contract since the parties demonstrated an unambiguous intent to enter into a contract, agreed on the essential terms of that contract, and supported the agreement with valid consideration. *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del.Ch.1977).

A valid contract having been formed on the telephone, the Delivery Memo can only be considered as an offer by Miller to modify the existing contract. An offer to modify a contract is ineffective unless agreed to by all parties and supported by valid consideration. *De Cecchis v. Evers*, 174 A.2d 463, 464 (Del.Super.1961). As the discussion above indicates, Newsweek never agreed to any of the terms of the Delivery Memo and no additional consideration was present. Thus, the terms of the Delivery Memo are unenforceable under common law as well.

Based on the above, the Court concludes that the terms of the Delivery Memo are not enforceable against Newsweek and Miller's claim for liquidated damages and late penalties under those terms must fail. Accordingly, the Court will grant Newsweek's motion for summary judgment as to Count One of Miller's complaint, deny Miller's summary judgment motion as to Count One, and dismiss Count One.

**C. County Two: The Bailment Relationship**

In Count Two, Miller contends that Newsweek is liable for the reasonable value of the lost negatives due to its negligent breach of its duties as a bailee. (D.I. 1 at ¶¶ 1–11.) Newsweek denies the existence of any bailment relationship obligating it to exercise reasonable care. (D.I. 45 at 11.) Moreover, Newsweek contends that even if such a relationship is found, there is a genuine issue of fact concerning the alleged breach of its duties and thus summary judgment for Miller is inappropriate on Count Two. (*Id.*)

The Court has previously held that a valid contractual relationship exists between the parties. That relationship can best be described as a bailment. "A bailment may be defined as a delivery of personalty for some particular purpose ... upon a contract, expressed or implied, that after that purpose has been fulfilled it shall be redelivered to the person that delivered it...." *State v. Warwick*, 108 A.2d 85, 89 (Del.Super.1954). In the case at bar, Miller agreed to deliver the Shapiro negatives to Newsweek so that Newsweek could review them for publication. (D.I. 30 at 46.) Once that purpose was achieved, Newsweek was to return the negatives to Miller, as they remained his property. (D.I. 30 at 22; 38 at 8.) Thus the contractual relationship between the parties fits squarely within the definition of a bailment advanced by the *Warwick* court.[11]

There are three types of bailment contracts, each imposing a different standard of care on the bailee with respect to his care of the bailed property. A bailment for the sole benefit of the bailee (where a bailor lends property to a bailee at no charge) requires a great amount of care on

---

11. The fact that the contract also included a provision for the purchase of the use of one or more negatives for publication does not change its nature as a bailment contract. 8 Am.Jur.2d Bailments, § 40 (1980). The parties' relationship actually envisioned two separate contracts, one coming into existence at the expiration of

the other: the bailment contract at issue in this case, and a separate agreement in which the defendant would purchase the use of the negatives for its story on Shapiro. The second contract never took place since the defendant never ran the story and thus did not purchase the use of any negatives.

the bailee's part, and the bailee will be liable for the slightest negligence. *Ferrick Excavating and Grading Co. v. Senger Trucking Co.*, 506 Pa. 181, 484 A.2d 744, 749 (1984). Conversely, a bailment for the sole benefit of the bailor (where a bailee gratuitously holds the property of another) requires a minimum degree of care on the bailee's part, and the bailee will be liable for gross negligence only. *Bernstein v. Noble*, 487 A.2d 231, 234 (D.C.App.1985). Finally, a bailment for the mutual benefit of both parties (where both parties expect some benefit from the relationship) requires the bailee to exercise reasonable care in the handling of the bailed property. *Lissie v. Southern New England Telephone Co.*, 33 Conn.Super. 540, 359 A.2d 187, 189–90 (1976).

The bailment relationship in this case was for the mutual benefit of both parties. The classification of a bailment as one for mutual benefit does not require a finding that both parties realized a specific tangible benefit. It is sufficient if a possibility existed of some benefit accruing from the relationship. *American Enka Co. v. Wicaco Machine Corp.*, 686 F.2d 1050, 1053 (3d Cir.1982) (applying Pennsylvania law, but *accord* 8 CJS Bailments, § 8 (1962)). Both parties in this case entered into the bailment relationship with an expectation of commercial benefit. Miller is a professional photographer who derives a profit from the publication of his photographs in major publications. (D.I. 30.) His sole purpose for delivering the Shapiro negatives to Newsweek was the opportunity to sell the use of those negatives for $100–$200 each. (D.I. 30 at 46.) Similarly, Newsweek is a profit making magazine publisher which accepted the negatives solely for the purpose of reviewing them for publication. (D.I. 31; 31; 33.)

■ Since the bailment contract is one for the mutual benefit of both parties, Newsweek owed a duty of reasonable care in its handling of the negatives. *Senger Trucking Co.*, 506 Pa. 181, 484 A.2d at 749; *Lissie*, 33 Conn.Super. 540, 359 A.2d at 189–90. Miller claims Newsweek breached that duty by failing to employ adequate

recordkeeping procedures for keeping track of black and white negatives submitted for publication. (D.I. 42 at 35–40.) In response Newsweek insists that there is a genuine issue of material fact regarding the reasonableness of its conduct, and summary judgment is thus inappropriate. (D.I. 45 at 14.)

Ordinarily a party alleging negligence bears the burden of proving it at trial. However, if a bailment contract exists, and the bailor establishes that the bailed property was delivered to the bailee in good condition and not returned, or returned in poor condition, a presumption of negligence arises and the bailee bears the burden of rebutting that presumption. *Balcar v. Aircrafters Inc.*, 360 A.2d 155, 157 (Del.Super.1976); *Morgan Millwork Co. v. Dover Garage Co.*, 108 A. 62, 64 (Del.Super.1919.)

Miller has established by uncontroverted evidence that the 72 Shapiro negatives were picked up by Newsweek's courier (D.I. 30 at 47; 32 at 18), received in good condition by Newsweek (D.I. 33 at 4–6), and never returned to Miller. (D.I. 30 at 50–59.) This is enough to create a presumption of negligence and place the burden on Newsweek to come forward with some evidence of the reasonable care it employed in order to rebut the presumption. *Balcar*, 360 A.2d at 157; *Dover Garage Co.*, 108 A. at 64. Miller contends that Newsweek has failed to present such evidence and summary judgment is thus appropriate under Federal Rule of Civil Procedure 56. (D.I. 42 at 35–40.)

■ The United States Supreme Court has recently shed additional light on the standards applicable to summary judgment motions under Federal Rule 56. *Anderson v. Liberty Lobby Inc.*, —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The rule has always been that a court may not grant summary judgment on an issue unless there is no genuine issue of material fact with regard to that issue, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (1986). After *Anderson*, it is clear that in order for an issue of fact to be genuine and thus make summary judgment inappropriate, there

must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party on that issue. *Anderson*, —— U.S. ——, 106 S.Ct. at 2511. The existence of evidence which is merely colorable or not particularly probative will not render summary judgment inappropriate. *Id.*

 In the instant case, Newsweek has failed to present any evidence to rebut the presumption of negligence. The testimony of Newsweek's own employees indicates that Newsweek had no procedures for recording the receipt of black and white negatives (D.I. 33 at 19), tracking the negatives while in its possession (D.I. 32 at 48; 33 at 11), or ascertaining if the negatives were safely returned to the photographer (D.I. 32 at 20). Thus summary judgment is appropriate under *Anderson* since Newsweek has not established the existence of any facts to support a verdict in its favor. On the contrary, the absence of any evidence rebutting the presumption of negligence would require the jury to honor the presumption and find for Miller on this issue. *Bernstein*, 487 A.2d at 234; *Smith's Transfer and Storage Co. v. Murphy*, 115 A.2d 300, 303 (D.C.App.1955).

Based on the above, the Court will grant Miller's motion for summary judgment with regard to the liability issue of Count Two of his complaint and deny Newsweek's summary judgment motion on that count.

**D. Damages**

 Having determined that Newsweek is liable for the loss of the Shapiro negatives, the Court must consider whether a proper damage figure can be determined at this stage of the litigation. Miller and his expert have submitted affidavits valuing each negative at $1500. (D.I. 42 at Exs. A, p. 3, H p. 2.) Newsweek's expert suggests that this figure is excessive since there is currently little or no demand in the photojournalism industry for these negatives. (D.I. 46 at 2.) The Court is thus faced with a clear dispute of fact with regard to the value of the Shapiro negatives. Since this dispute of fact is both genuine and material under the standard advanced by the *Anderson* Court, the Court will deny both parties' motions for summary judgment on the damage issue of Count Two.

## IV. CONCLUSION

For the reasons advanced above, the Court will take the following action: (1) grant Newsweek's motion for summary judgment as to Count One, deny Miller's motion as to that count, and dismiss Count One of the complaint; (2) grant Miller's motion for summary judgment on the liability issue of Count Two, and deny Newsweek's motion on that issue; and (3) deny both parties' motions for summary judgment as to the damage issue of Count Two.

An order will be entered in accordance with this Memorandum Opinion.