Kathleen Jo **RYAN**, d/b/a Kathleen Jo Ryan Productions, Plaintiff,

v.

**AER LINGUS, Defendant.**

**No. 93 Civ. 6290 (RPP).**

United States District Court, S.D. New York.

Oct. 12, 1994.

---

Cavallo & Wolff, New York City by Nancy E. Wolff, for plaintiff.

Smith, Steibel, Alexander & Saskor, P.C., New York City by Ludwig A. Saskor, for defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is a diversity action for breach of bailment which was tried non-jury on June 10 to June 15, 1994 and reconvened on July 21, 1994 to complete the evidence on the issue of damages. This opinion constitutes the Findings of Fact and Conclusions of Law of the Court.

### Background

Plaintiff Kathleen Jo Ryan is a professional photographer and photograph producer residing in the State of Washington. Defendant Aerlinte Eireann PLC, doing business as Aer Lingus ("Aer Lingus") is a corporation organized and existing under the laws of Ireland, whose shares are owned in whole or in part by the Republic of Ireland, and is doing business at 122 East 42nd Street, New York, New York.

Aer Lingus is in the business of air travel and, in that connection, promotes tourism to Ireland and from time to time uses photographs in its advertising and promotional materials. Since 1979 Plaintiff and Aer Lingus have had a professional relationship. In 1983, Aer Lingus became one of the sponsors of a book authored by Plaintiff, *Irish Traditions*, (Pl.Ex. 5), featuring 122 of Plaintiff's photographs, as well as articles by prominent Irish poets and authors. In that connection, Defendant provided Plaintiff with free air transportation to Ireland and back on five occasions.

*Irish Traditions* was published in 1985 for Harry N. Abrams, Inc. During the period 1979–1985, Plaintiff also had a professional relationship with the Irish Tourist Board and Bailey's Irish Cream (Ex. 10(a–f)), and photos used by those organizations were also among the 122 photographs in *Irish Traditions* (Pl.Ex. 5). *Irish Traditions* was also the source for a calendar, comprised of 12

photographs, two posters and six note cards. In 1981, Aer Lingus purchased 4,000 of Plaintiff's shamrock photo design note cards (Pl.Ex. 20(a)), and in February 1985, Aer Lingus purchased 5,000 of Plaintiff's 4-color embossed custom design note cards featuring a photograph of Slea Head, Dingle, Ireland. (Pl.Ex. 20(b))

In the summer of 1990, Plaintiff got in touch with the person she knew best at Aer Lingus, Patrick Hanrahan, Manager of Public Relations, for Aer Lingus in New York. Plaintiff said she was planning to do a video on Ireland, and Hanrahan agreed to provide her with a complimentary round-trip ticket. On October 9, 1990, prior to leaving for Ireland, Plaintiff met with Hanrahan and asked if Aer Lingus would have any interest in using any of her photographs from the trip in its brochures. Hanrahan told Plaintiff that the advertising department was doing a new brochure, and Hanrahan and Plaintiff visited with Richard Murphy, Manager of Advertising at Aer Lingus, who had responsibility for producing brochures. Murphy indicated he would be glad to have Plaintiff's photographs considered for the new brochure.

Plaintiff, who had not been to Ireland in five years, flew to Ireland two days later. After staying two days in Dublin, she travelled west to photograph landscapes and antiquities, shooting 20 rolls (720 exposures) of film. She returned to Dublin after a week of photography to pursue other projects. (Pl. Ex. 43(b))

Plaintiff returned to the United States on October 27, 1990 and went to the State of Washington where she developed the 720 exposures, edited them over a week or two week period, and selected 100 color transparencies of the landscape of western Ireland and antiquities. She also selected forty color transparencies from her "classic collection," including a few from *Irish Traditions* and sent them in archival sheets, stamped with a copyright, by Federal Express to Hanrahan and Murphy with a letter dated November 27, 1990 (Pl.Ex. 21). The letter reads:

November 27, 1990

Pat Hanrahan

Dick Murphy

AER LINGUS
122 East 42nd Street, 7th Floor
New York, NY 10168
Dear Pat and Dick:

Thank you again for the opportunity to travel in elegant style on my favorite airline enroute to photograph my favorite country.

Enclosed are one hundred forty (140) original color transparencies to consider for advertising and brochure production for Aer Lingus. The slide sheets, each containing twenty (20) slides, are numbered. The sheets numbered 1–5 are from my trip in October, while 6–7 are from past efforts. There are also book images that you may also want to consider.

As these are original color transparencies the policy of the American Society of Magazine Photographers is that there be a reimbursement value of $1,500 for loss or damage to each original color transparency submitted. Please sign the attached copy of this letter as your receipt of these transparencies.

Thank you again. I hope there are images that Aer Lingus can use that will inspire your customers to fly frequently to Ireland.

Thanks.

Kathleen Jo Ryan

/s/ Signature
Dick Murphy, Aer Lingus
Pl.Ex. 21.

Defendant did not return a copy of her letter with Murphy's signature as suggested in this letter. Plaintiff called Aer Lingus to make sure her package, which was uninsured, had arrived and was assured by Hanrahan it had arrived in good order. She also testified that she tried but could not reach Murphy on January 8, 1991, but did leave a message for him. In February or March 1991 she did reach Murphy on the telephone and he told her Aer Lingus was not using the photographs in the brochure but asked if it was all right to keep them to review for other brochures, to which she assented. There was no discussion of Murphy's failure to acknowledge the reimbursement value of $1,500 per color transparency set forth in the

letter of November 27, 1990, nor did Plaintiff make agreement thereto a condition for retention of the transparencies.

In August 1991, Plaintiff telephoned Hanrahan, asked about the transparencies, and was told he would speak to Murphy. On November 6, 1991, she again called Hanrahan (Pl.Exs. 24(a) and 24(b)), and on November 13 and 14, 1991, Plaintiff was in New York and talked to Hanrahan. Hanrahan told her Murphy was retiring and that she should call Murphy directly. In December 1991, she called Murphy but could not reach him. Murphy retired on January 21, 1992. On February 24, 1992, Plaintiff called Hanrahan and asked for her transparencies. Hanrahan then commenced an unsuccessful search for the transparencies at Aer Lingus. During March, April, May and June 1992, she called Hanrahan from time to time.

On July 29, 1992, Plaintiff called Hanrahan and was told that, as far as he could determine, her transparencies were missing and that the best person to write was Bernard Lynch, Aer Lingus' Passenger Marketing Manager, North America. On August 3, 1992, Plaintiff wrote Lynch, stating her color transparencies had not been returned and attached a purported copy of her letter to Hanrahan and Murphy dated November 27, 1990 (Pl.Ex. 27). In fact, the purported copy differed from the original (Pl.Ex. 21) in two significant respects. Instead of requesting a signed receipt, the purported copy states, "Upon receipt of these originals this our agreement," apparently referring to the American Society of Magazine Photographers' (ASMP) reimbursement value of $1,500 for each color transparency lost or damaged. Plaintiff also eliminated from the purported copy the line requesting Murphy's signature as a receipt.

After receipt of a letter from Plaintiff by facsimile transmission on October 6, 1992, Lynch delegated to Hanrahan the duty of responding to Ryan's August 3, 1992 letter which Hanrahan did on October 8, 1992. Hanrahan then sought to locate Plaintiff's color transparencies from outside advertising agencies and brochure designers for Aer Lingus who might have had access to them. Hanrahan notified Plaintiff that these efforts were fruitless, and on January 12, 1993, Plaintiff demanded at least $210,000 for her loss. Negotiations proved unsuccessful and thereafter Plaintiff initiated this action.

At trial both Hanrahan and Murphy acknowledged that Plaintiff's transparencies were received and Murphy testified that he "believe[d]" that Pl.Ex. 21 is a copy of the letter which accompanied the transparencies. He did not appear to be sure. Murphy testified the transparencies arrived too late in the fall of 1990 for use in the brochure and were held for consideration for the 1991 brochures, but that the brochure designer, James Bitros, rejected them. As far as he knew, the photographs were still in his former office. The photographs have not been returned to Plaintiff.

### Aer Lingus as Bailee

On these facts, the Court finds that Defendant was a bailee for the mutual benefit of the parties. *Craig v. John Wiley & Sons, Inc.*, No. 3111/85 (N.Y.Sup.Ct., N.Y. County, June 19, 1985) (Plaintiff's delivery of portfolio of photographic materials so defendant could determine commercial value to defendant was bailment of mutual benefit); *Miller v. Newsweek*, 660 F.Supp. 852 (D.Del. 1987) (Agreement by photographer to deliver negatives so news magazine could review for publication constituted bailment contract for mutual benefit).

As a bailee for the mutual benefit of the parties, Aer Lingus had a duty to exercise reasonable care in the handling of the bailed property. *See Craig v. John Wiley & Sons, Inc., supra.* In failing to return Plaintiff's color transparencies, Defendant is presumed negligent and to have failed to use reasonable care. *See Rosen v. Village Chevrolet, Inc.*, 63 Misc.2d 174, 311 N.Y.S.2d 230, 234 (1970) ("In the case of a mutual bailment there is a presumption of negligence ... which arises from proof of bailment and failure to deliver the said bailed property." (citation omitted)); 9 N.Y.Jur.2d § 147 (1980) ("If the bailor proves that the property was left in the possession of the bailee and was not returned ... [s]he has established a prima facie case, based upon a presumption of negligence.")

Defendant has not shown that any actions by Plaintiff caused the loss of the color transparencies. Accordingly, Plaintiff is entitled to damages for Defendant's breach of the bailment agreement.

### Damages

Plaintiff asserts she is entitled to damages of $210,000, i.e., $1,500 for each of the 140 color transparencies that Defendant has failed to return based on the damages for loss as referred to in the letter of November 21, 1990, as well as testimony of her expert witness, Jane Kinne, an expert on the value of stock photography.

The letter of November 27, 1990 is not binding on Defendant. The only agreement between Plaintiff and Murphy was an oral agreement that was reached immediately before Plaintiff went to Ireland in October, 1990, and that agreement did not include any discussion of liquidated damages. In that conversation, Defendant agreed to take custody of the photographs Plaintiff would submit and to have them considered for a brochure Aer Lingus was having designed. The parties did not discuss stipulating damages in the event of loss, let alone the figure Plaintiff now seeks.

Plaintiff's letter of November 27, 1990 (Pl. Ex. 21) *sought* agreement to stipulate damages of $1,500 for each transparency submitted, but Murphy failed to signify his agreement to such damages by signing and returning a copy of the letter as requested by Plaintiff in the letter, and when this copy was not returned, Plaintiff failed to demand that it be signed and returned.

Normally, a letter such as Pl.Ex. 21 would constitute a written confirmation of an existing contract under § 2–207 of the U.C.C. and would be binding on the parties in view of Defendant's failure to object, even though the confirmation contained an additional term not previously discussed. However, because the additional term contained in the confirmation materially alters the agreement of the parties, it is not binding. *See* U.C.C. § 2–207. In *Miller v. Newsweek, Inc.*, 660 F.Supp. 852 (D.Del.1987), the court found a similar valuation provision in a delivery memo accompanying 72 photographic negatives to constitute a material change in the

parties' agreement in view of the undue hardship and surprise it would impose on Newsweek. *Id.* at 857.

In *Roberts v. Fazio, et al.*, No. 92–0420, (D.Ariz. Dec. 6, 1993), the court under similar circumstances found a loss provision in a delivery memo to be non-binding. In New York, defendant's receipt of slides without any signed acknowledgment does not necessarily mean that it acquiesced by silence to all of the terms of plaintiff's proffered conduct as contained in its delivery memo. *Focus on Sports, Inc. v. Newsweek, Inc.*, 158 A.D.2d 351, 551 N.Y.S.2d 39, 40 (1 Dept. 1990); *see also Albrecht Chemical Co., Inc. v. Anderson Trading Corp.*, 298 N.Y. 437, 84 N.E.2d 625 (1949); *Maisel v. Gruner & Jahr USA, Inc.*, 89 A.D.2d 503, 452 N.Y.S.2d 192 (1982).

■ Here, Plaintiff's original letter of November 27, 1990 that accompanied the transparencies (Pl.Ex. 21) had a line designated for Mr. Murphy's signature, apparently to confirm receipt and acknowledge acceptance of the new term, i.e., reimbursement value of $1,500 per transparency. Mr. Murphy, however, never signed the November letter, *see Lightwave Technologies, Inc. v. Corning Glass Works*, 725 F.Supp. 198, 200 (S.D.N.Y. 1989) (signature lines in draft agreement suggested that parties did not intend to be bound without obtaining signatures); and, therefore, Defendant never agreed to the condition of paying $1,500 per transparency for each lost or damaged transparency.

■ Plaintiff knew in November and December 1990 that she had not received an acknowledgment of her letter of November 27, 1990 (Pl.Ex. 21) and did not insist, or attempt to insist, that Defendant agree to the stipulated damages if it wanted to retain the color transparencies. Also, later in 1991, when Murphy asked if it would be all right if Defendant held the photographs for next year's brochure, Plaintiff assented without requiring him to agree to her value as stipulated damages. Plaintiff was fully aware of Defendant's lack of agreement to the stipulated damage clause as shown by her action in furnishing Defendant with a false cover letter on August 3, 1992, stating that the

value had been agreed upon. Accordingly, Plaintiff is not entitled to $1,500 per color transparency as stipulated damages pursuant to the November 27, 1990 letter. Rather, the amount of reimbursement for Plaintiff's color transparencies must be ascertained by evidence of their value which must be determined circumstantially since the actual color transparencies are not available.

Plaintiff's proof of the market value of her 140 color transparencies is based on her success as a photographer, including recognition by various public figures, evidence of her care in selecting color transparencies for the Defendant's consideration, examples of her photography, and the testimony of her expert witness, Jane Kinne, an accepted expert witness on the value of photographs.

The Plaintiff has been a professional photographer for over twenty years, taking pictures, having exhibitions of her photography, producing photographic projects, calendars, posters, and through her company, Image Marketing, photograph note cards. She also creates video films of still images.

Plaintiff testified that she has earned over $48,000 in royalties from *Ranching Traditions* (1991), a book she wrote containing between 300–400 of her photographs. In both 1991 and 1992, she produced a calendar of photographs from *Ranching Traditions* for which she has received $16,000 in royalty income. She has received a $50,000 advance for a half hour video film of 254 still images of the American West.

For *Irish Traditions* (1985) she contributed 122 of her photographs and an essay for which she testified she has received $32,000 in royalty income. She has also produced an *Irish Traditions Calendar* (1985) containing 12 of the *Irish Traditions* photographs for which she received a $1,500 advance against royalties, as well as two posters and six note cards from eight *Irish Traditions* photographs for which she received advance royalties of $2,500. In addition, she has, through Image Marketing, sold Defendant 4,000 shamrock photo note cards with envelopes for $1,600 in 1981, and 5,000 note cards of a photograph of Slea Head, Dingle, Ireland, with imprints for $3,950 in 1985.

In addition to evidence recognizing Ms. Ryan's success as a professional photographer, Plaintiff relies heavily on the testimony of Ms. Jane Kinne, an accepted expert witness on the value of photographs. Ms. Kinne based her valuation of the color transparencies on an examination of the technical excellence of Plaintiff's published photographs, Plaintiff's eye for subject matter, and discussions with Plaintiff as to the care she took in editing and culling the transparencies sent to Defendant. She also placed some value on the timelessness of Plaintiff's subject matter, Irish landscapes and antiquities. Her opinion estimated Plaintiff's lost transparencies at an average value of $1,500 a piece, the value suggested by the American Society of Magazine Photographers for insurance purposes for photographs held by users.

Ms. Kinne, who was long employed by a leading stockhouse,[1] testified that it is the practice for stockhouses to assign a value of $1,500 a slide for loss or damage to any of its photographs selected by and delivered to potential licensees for possible use. The licensee selects from the stockhouse inventory and takes only the few slides it intends to use. Only a small portion of the photographic inventory of a stockhouse may be used at all, 25% in some areas; the inventory of a stockhouse which is taken by professionals and professionally edited is further culled by about 10% a year.

Although Ms. Kinne had participated in the promulgation of ASMP's recommended stipulated damage figure of $1,500 per lost photograph and testified that $1,500 valuation for damage or loss by its customers was a generally accepted norm for stockhouses, she also testified that stockhouses do not repay the photographer for any loss or damage by the stockhouse and only reimburse the photographer $750 of the $1,500 received for a lost photograph from the customer. She also testified that stockhouses were se-

---

1. A "stockhouse" or stock photography house is a business establishment that provides negatives or transparencies ("stock photography") to customers who seek them for advertising or similar purposes for one time or limited use.

lective as to quality in accepting photographs from photographers.

The valuation of Ms. Kinne is weakened by the fact that she never viewed the photographs in question and had to depend on Plaintiff's advice to determine to what extent they had been adequately culled. In *Morrin v. 140 West 57th Street Corp.*, No. 21648/92 (N.Y.Sup.Ct., N.Y. County, Nov. 15, 1993), another case in which Ms. Kinne was called as an expert witness to appraise the value of photographic materials that had been destroyed, Ms. Kinne also reached a valuation of $1,500 per destroyed negative based in part on the assumption that 99% of the plaintiff's photographic exposures, whose value had been based on their uniqueness, had been culled. In the case at bar, Ms. Ryan testified that she selected 100 color transparencies from the 720 exposures she took during her October 1990 trip to Ireland and that 40 more were selected from her "classic collection," six of which had been printed in *Irish Traditions*.[2] Ms. Ryan's cull of the 720 exposures taken during the October 1990 trip was approximately 6 of 7 exposures, not 99 out of 100.

Furthermore, since Plaintiff did not accompany her photographs sent to Aer Lingus with a listing of subject matter, which is normal practice in the industry, it is hard to tell to what extent there were duplicative shots, a relevant factor in considering what percentage might be selected for use by a publisher.[3] Thus, there is some question as to whether Plaintiff's culling of her 720 exposures was adequate to equate her photographs to that of the inventory of a stockhouse and how many of them would have been selected for use by a publisher.

When one considers that the bulk of the lost color transparencies were photographed in a week of photographic activity in Ireland, the capital value of $150,000 which Plaintiff seeks to obtain for the loss of those 100 color transparencies seems unwarranted.

Although every photograph is by definition unique, Plaintiff has failed to show any uniqueness of subject matter in her color transparencies. Indeed, views of western Ireland and antiquities are by themselves not unique, and the timelessness of Plaintiff's work, as testified to by Ms. Kinne, would seem to negate somewhat the degree of uniqueness.

Defendant called as its expert witness, James Bitros, a producer and a designer of brochures, who had viewed the color transparencies in 1991 as the designer of Aer Lingus' annual brochure. Bitros found the photos, although technically good (in focus), to be of poor quality, dreary and dark, and to consist of many multiple shots of the same scene. Bitros testified that the photographs were not marketable for the type of quality brochures he designed. If any were marketable, he placed a value of $250—$400 for the one-time license of each marketable slide. He also testified that the color transparencies were not unique and could be replaced in a three or four week trip to Ireland at a total cost of $15,000. He offered no testimony as to the market value of Plaintiff's lost color transparencies. Bitros' testimony did not establish a market value for Plaintiff's transparencies and his testimony as an expert for that purpose is rejected. It does, however, together with Plaintiff's failure to present greater proof of the value of her photographs, cast significant doubt on Kinne's valuation.

Importantly, Plaintiff has offered no evidence of an established sales price or use price for her Irish photographs, nor has she established the frequency with which her Irish photographs are used or sold. Although such proof could not be demonstrated from the lost 100 color transparencies from the October 1990 visit to Ireland, presumably, it could have been demonstrated from Plaintiff's portfolio of classic Irish photographs and from the photographs taken from the *Irish Traditions* collection of 122 photographs from which either three or six photo-

---

**2.** In deposition, Plaintiff had testified that only three had previously been printed in *Irish Traditions*.

**3.** Defendant's expert, James Bitros, who examined the 140 color transparencies testified that there were many duplicate shots of the same scenes.

graphs were given to Defendant. These forty photographs were about ten to twelve years old and presumably a history of the income they had produced over that period could have been presented to extrapolate a value for them during the period of Plaintiff's copyright. Assuming Plaintiff's royalty income of $32,000 from *Irish Traditions* was the sole result of the 122 of Plaintiff's photographs therein and not attributable to Plaintiff's authorship or book production efforts, these photographs generated about $262 a piece. If one ascribes the calendar income and note card income to the group of 122 photographs, one reaches a value per photograph of slightly more than $300. There appears, however, to have been no sales or uses of these photographs in the last eight years.

In view of this state of the evidence, in order to assess the fair value of Plaintiff's photographs, the Court turns to the value for Plaintiff's *Irish Traditions* photographs determined by Harry N. Abrams, Inc. and Plaintiff in their negotiations to reach a value for the possible loss of her classic Irish photographs and for her 100 color transparencies. For *Irish Traditions,* Plaintiff selected and sent 2,000 slides to her publisher, Harry N. Abrams, Inc. From that group, nine out of 10 were culled and 200 were selected for publication. Of the 200, 122 were actually used in the book. Plaintiff acknowledged that Abrams would not agree to a loss value of $1,500 per color transparency that he held for reproduction but did agree to a loss value of $300 per color transparency. (Def.Ex. D, ¶ 2(d))

Accordingly, Plaintiff is entitled to $300 per color transparency totaling $42,000, plus interest, from January 21, 1992, the date of Mr. Murphy's retirement from Aer Lingus.

IT IS SO ORDERED.