ROSENBERG v. EQUITABLE TRUST CO.

Civ. A. No. 486.

District Court, D. Delaware.

Dec. 5, 1946.

William H. Foulk and Herbert L. Cobin, both of Wilmington, Del., for plaintiff.

James R. Morford and Thomas Cooch (of Marvel & Morford), both of Wilmington, Del., for defendant.

LEAHY, District Judge.

█ Despite the factual debris and the elaborate arguments of counsel on contract law,[1] the issues are simple. What was in-

---

[1] Federal courts have jurisdiction to establish a claim against a decedent's estate; but such a court cannot seize property which is in the possession of an executor appointed by a state court or impress a lien on such property or interfere with the administration of such an estate. One asserting a claim against a decedent's estate may resort to a federal court for a judgment which simply ad-

tended to be the exchange for Mrs. Bradford's promise to leave her nephew $20,000? There are three possibilities. First, the parties may have intended that she receive nothing for her promise, or, in other words, that she intended a gift to Rogers. Second, the exchange for her promise may have been an interest in "Dunleith" which Rogers would have at the time of his death, however remote or small. Third, that the parties treated the acts of each as analogous to a quitclaim situation and Mrs. Bradford got the exchange intended. I think it so clear that Mrs. Bradford did not intend to make a gift that no further consideration will be given to that point; and, as I am unable to accept the second premise, I am deciding the case on the third one.

■■ In the quitclaim situation the consideration for the quitclaim is that the purchaser will get whatever interest, however dubious, the transferor had or might acquire. This may be nothing or something. The grantee receives exactly what is bargained for and he is not to be heard whether he received either no consideration or inadequate consideration.[2] Rogers' promise as found in the May 25, 1930 agreement was a promise to leave, in effect, a quitclaim deed to any interest he might have in Dunleith at the time of his death. In a legal sense, it is the same as if on May 25, 1930 he had given a formal quitclaim deed to be effective on the date of his death. The consideration in exchange for Mrs. Bradford's promise was the chance Rogers might have obtained an interest in Dunleith at the time of his death. The last paragraph of the May 25, 1930 agreement discloses clearly that the parties were aware Rogers had already given a life interest in his share to Mrs. Bradford and the remainder in fee to Annie Rogers duPont. From this it is obvious Mrs. Bradford knew at the time of the execution of the agreement that Rogers had no further interest in Dunleith. It is just as clear from the agreement that the parties did not contemplate that Rogers was to acquire any specific interest from any particular source. From all the circumstances, it is quite apparent that Mrs. Bradford wished to be secure in the knowledge that if Rogers did die holding any interest in Dunleith it would pass, under his will, to her or her estate. From an examination of the facts, there was the possibility that prior to May 4, 1931, when Shapdale, Inc., was formed, Rogers might have acquired some interest from George Zinn, Jr., Flora Zinn, William duPont, Jr., or Marian Somerville; among these were blood relatives from whom he might have received an interest, either by way of an inter vivos gift or testamentary disposition. On May 4, 1931, Flora Zinn transferred her interest to Shapdale, Inc., and after that all legal interests were held by Equitable Trust Company and Delaware Trust Company, as trustees, and Shapdale, Inc. There was a possibility always that Rogers might have acquired some interest from the latter two companies up until February 6, 1934, when Mrs. Bradford acquired an option covering those interests. Concededly, the chance for Rogers to make acquisition of a part of the estate—it was merely a chance—was very slight; but, it appears to me that Mrs. Bradford wished to bargain for any interest which Rogers might acquire, even if it be based upon chance and resulted in no interest. Nothing was acquired by Rogers at the time of his death; yet, she can not be heard to complain as this is precisely the analogue which we have drawn to the quitclaim situation above.

The agreement which the evidence shows the parties made is a very unusual one because Mrs. Bradford, in exchange for her promise, was taking a chance on a chance—that not only would Rogers acquire an interest in Dunleith prior to his death, but also that he would not convey away such an interest prior to his death.

■ The issue here is whether Mrs. Bradford was bargaining for a chance to acquire some interest or whether she was bargaining for some definite interest in Dunleith however substantial or small. It is a familiar rule of construction that where a contract is ambiguous, that construction

---

judicates the validity and amount of the claim. For federal jurisdiction in probate matters, see heavily documented note in 158 A.L.R. pp. 9–76.

[2] Williston, on Contracts (Rev.Ed.) § 115, n. 8 for cases.

given to it by the acts and conduct of the parties[3] with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight. A practical construction placed by the parties upon the instrument is the best evidence of their intention. Radio Corporation of America v. Philadelphia Storage Battery, 23 Del.Ch. 289, 6 A.2d 329, 340. The conduct of Mrs. Bradford subsequent to May 25, 1930, indicates that by the time of her death she wished to have complete control over Dunleith. The option which she obtained on February 6, 1934, put her in a position to have complete title in herself. In spite of this, she continued to treat the May 25, 1930 agreement as a live obligation to pay to Rogers the amount promised. One scene communicates much. On June 3, 1940, this agreement was assigned to the St. Georges Trust Company, as security for a loan made to Rogers. From the evidence before me, Mrs. Bradford helped to pay off the loan to the extent of $1500 and *took an assignment of the agreement from the Trust Company to herself* as her security for the debt then due her from Rogers by means of her discharging his obligation to the bank. Moreover, on November 2, 1940, she entered into the supplemental agreement with Rogers, ratifying and confirming the May 25, 1930 agreement; and a few days later, while in Philadelphia, she certified under oath that she had not made any other agreements with respect to the disposition of her property by will, other than that of May 25, 1930. Certainly these acts on the part of Mrs. Bradford, knowingly performed, which made it possible to induce others to rely upon her obligations as found in the May 25, 1930 agreement, have major significance. I do not advert to these special circumstances as constituting an estoppel against Mrs. Bradford or against her estate from denying the validity of the agreement. The reference has been made simply to support the construction that Mrs. Bradford, at all times, regarded the transaction with her nephew as in the nature of a quitclaim deed. Since in 1940 Mrs. Bradford had sole control over the legal interests in Dunleith, her

behavior pattern reflects the original intention of bargaining for Rogers' chance of acquiring any interest in Dunleith.

 Defendant's argument, i. e., assuming arguendo that the May 25, 1930 agreement was valid, the promise of Mrs. Bradford could not survive Rogers' death, is without merit. The agreement specifically provides that the "bequest shall be binding should either or both die without a will"; certainly this shows that the agreement was to be operative even after the death of either or both parties.

Judgment should be for plaintiff.

---

[3] See Attorney General v. Drummond, 1 Drury & Warren 353, 368, where Lord Chancellor Sugden said: "Tell me what you have done under such a deed, and I will tell you what that deed means."