**Robert M. HAFT, Plaintiff,**

v.

**DART GROUP CORPORATION, Crown Books Corporation, and Trak Auto Corporation, Defendants.**

**Civ. A. No. 93–384–SLR.**

United States District Court,
D. Delaware.

Feb. 22, 1995.

Lawrence C. Ashby, and John S. Grimm, of Ashby & Geddes, Wilmington, DE (David J. Hensler, Lisa Bonanno, Jonathan A. Constine, and Mitchell E. Zamoff, of Hogan & Hartson, Washington, DC, of counsel), for plaintiff.

Edward M. McNally, Lewis H. Lazarus, and Joseph C. Schoell, of Morris, James, Hitchens & Williams, Wilmington, DE (Michael R. Klein, Gary D. Wilson, Mary C. Manemann, Christopher P. Howard, Timothy Fox, and Bruce L. Plotkin, of Wilmer, Cutler & Pickering, Washington, DC, of counsel), for defendants.

OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

This is the latest chapter of the long and complicated litigation history between Robert Haft ("plaintiff") and several of the companies controlled by his family: Dart Corporation ("Dart"), Crown Books Corporation ("Crown"), and Trak Auto Corporation ("Trak"). Plaintiff, a former employee and board member, *inter alia*, of Dart and Crown, brought suit against Dart, Crown and Trak alleging five counts of breach of contract (Counts I–III, VI, and VIII), one count of replevin (Count IV), and sought declaratory judgment in three counts (Counts V, VII and IX). After a two-week jury trial, the jury returned answers to special interrogatories concluding that: Dart and Crown terminated plaintiff without good cause; plaintiff did not voluntarily terminate his employment with Dart and Crown; and plaintiff did not fail in his duty to mitigate. (D.I. 133) The jury awarded plaintiff $18,856,964 in damages for Dart's breach of the Dart Employment Agreement and $12,800,910 for Crown's breach of the Crown Employment Agreement. (*Id.* at ¶ 2, ¶ 5) Remaining for the court to resolve are the following issues: the appropriate damages for Crown's breach of the Incentive Stock Agreement ("ISA") (Count III), declaratory judgment on the Stock Option Agreements claim (Count VII), and declaratory judgment on the Total Beverage claim (Count IX).

This court has subject matter jurisdiction by virtue of diversity of citizenship. This opinion shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. BACKGROUND [1]

### A. Incentive Stock Agreement—Count III

On August 30, 1989, plaintiff and Crown entered into the ISA which authorized Crown

---

1. A complete discussion of the background of the parties and issues involved in this litigation can be found in two of the court's prior opinions

to issue stock to plaintiff as an incentive for continued employment with Crown. (PX 5) Plaintiff, in turn, paid Crown $203,750, through a non-interest bearing promissory note due January 2, 2004, in exchange for 100,000 shares of Crown stock. (DX 217) The ISA restricted to whom plaintiff could transfer the shares. (PX 5 at ¶ 3) The ISA allowed Crown to repurchase the shares at the purchase price if plaintiff either voluntarily terminated his employment or Crown terminated plaintiff for good cause (defined as being convicted of a felony involving moral turpitude). (*Id.* at ¶ 2(a)) Crown's right to repurchase the shares, however, terminated when, *inter alia,* Crown terminated plaintiff for any reason other than just cause as defined *infra.* (*Id.* at ¶ 2(b)) In such an instance, Crown was required to issue to plaintiff an unrestricted stock certificate representing the shares issued. (*Id.* ¶ 4)

On August 4, 1993, Herbert Haft, on behalf of Crown, informed plaintiff that in Crown's view plaintiff had voluntarily terminated his employment and, because of said action, Crown would cancel plaintiff's promissory note and repurchase the shares at issue. (PX 385) The following day plaintiff requested Crown to issue a new stock certificate without the transfer restriction, in compliance with the ISA. (D.I. 98, Ex. A at ¶ 35) Crown has refused to do so. (*Id.*; D.I. 149 at 1115)

On August 27, 1993, plaintiff filed his First Amended Complaint and sought declaratory judgment that he was entitled to the reissuance of stock certificates without restrictions on their use or transfer as required by the ISA or that judgment be entered for compensatory damages. (D.I. 7 at ¶ 83) On September 3, 1993, plaintiff filed his first motion for summary judgment in which he requested specific performance or, in the alternative, damages. (D.I. 9) On November 9, 1993, during oral argument plaintiff requested specific performance. (D.I. 32 at 18–19) This motion was denied. On February 28, 1994, plaintiff filed his second motion for summary judgment in which he requested damages based upon the price of the stock as of August 18, 1993: $24.25 per share.

dated December 30, 1993 and August 17, 1994.

(D.I. 58) In the pretrial order filed by the parties on August 25, 1994, plaintiff reiterated that request. (D.I. 98 at 15)

At trial, plaintiff introduced evidence indicating that the highest price attributed to the shares at issue within thirty days of August 5, 1993 was $24.50 per share. (D.I. 148 at 1041) Plaintiff did not put into evidence any testimony as to how long he intended to hold the unrestricted shares before attempting to sell them or how long it would take him to sell said shares. The jury determined that on June 30, 1993, Crown terminated plaintiff without good cause. (D.I. 133 at ¶ 4) The jury also determined that prior to his termination, plaintiff did not voluntarily terminate his employment. (*Id.* at ¶ 7)

## B. Stock Options—Count VII

Dart, Crown, and Trak each adopted stock option plans, in part, to provide incentives for key employees, officers, and directors. (D.I. 98, Ex. A at ¶ 20) Four plans are at issue.

Dart adopted the 1981 Dart Stock Option Plan ("1981 Dart Plan") on December 7, 1981 and authorized the issuance to plaintiff of options to buy 10,000 shares of Dart stock during each year that he was a Dart director. (*Id.* at ¶ 21) In accordance with the 1981 Dart Plan and its amendments, Dart issued to plaintiff four separate options to purchase 10,000 shares of Dart stock at a price between $71.50 and $104.50 per share (110% of their fair market value on the day the options were granted). These options were scheduled to expire between July of 1993 and July of 1996. (*Id.* at ¶ 21, ¶ 23; DX 304 at § 7A; DX 307 at ¶ 4, ¶ 10; DX 311 at ¶ 4, ¶ 10; DX 317 at ¶ 4, ¶ 10) None of these options were exercised and two expired in July of 1993 and July of 1994, respectively. (DX 307; 311) The termination provision of this plan for options issued after June 1986 provided that the options would terminate at the close of business the next business day after the individual ceased to be an officer, director or key employee. (DX 304 at § 15A)

Dart adopted the 1992 Dart Stock Option Plan ("1992 Dart Plan") on December 8, 1991. Said plan authorized the issuance of

(D.I. 44, 88)

options to purchase a total of 400,000 shares of Dart stock. (D.I. 98, Ex. A at ¶ 28; DX 320 at § 3A) In accordance with the 1992 Dart Plan, Dart issued to plaintiff one option to purchase 10,000 shares of Dart stock at $81.40 per share (110% of their fair market value on the day the option was granted). (D.I. 98, Ex.A at ¶¶ 28–29; DX 320 at § 7A; DX 321 at ¶ 3) The termination provision of the 1992 Dart Plan provided that the option would cease either three months after the participant was terminated or, if terminated for cause (defined as unlawful or illegal conduct or malfeasance of duties), it would cease on the date of termination. (DX 320 at § 14A)

Crown adopted its Stock Option Plan ("Crown Plan") on March 12, 1987. The Crown Plan authorized the issuance to plaintiff of options to purchase 20,000 shares of Crown stock. (D.I. 98 at ¶¶ 24–25; DX 305) In accordance with the Crown Plan, Crown issued to plaintiff five separate options to purchase 20,000 shares at a price between $21.45 and $23.93 per share (110% of their fair market value on the day the options were granted). These options were scheduled to expire between July of 1994 and July of 1997. (D.I. 98 at ¶ 25; DX 305 at ¶ 6(d); DX 312 ¶ 4, ¶ 10; DX 315 at ¶ 4, ¶ 10; DX 318 at ¶ 4, ¶ 10) Four of these options were unexercised and one had expired by the time of trial. (D.I. 98, Ex. A at ¶ 25) The termination provision of the Crown Plan provided that the option would terminate at the close of business the same day that the individual ceased to be an officer, director, or key employee of Crown or Dart. (DX 305 at ¶ 6(d))

Trak adopted the Trak Stock Option Plan ("Trak Plan") on March 24, 1987. The Trak Plan authorized the issuance to plaintiff of options to purchase 10,000 shares of Trak stock. (DX 306 at ¶¶ 1–2) In accordance with the Trak Plan, Trak issued five separate options to plaintiff to purchase 10,000 shares of Trak stock at a price between $6.60 and $13.75 per share (110% of their fair market value on the day the option was granted). These options were scheduled to expire between July of 1994 and July of 1997. (D.I. 98, Ex. A at ¶ 27; DX 306 at ¶ 6(d); DX 313 at ¶ 4, ¶ 10; DX 316 at ¶ 4, ¶ 10; DX 319 at

¶ 4, ¶ 10; DX 323 at ¶ 4, ¶ 10) Four of these options had not been exercised at the time of trial, and one had expired by the time of trial. (D.I. 98, Ex. A at ¶ 27) The termination provision of the Trak Plan provided that the option would terminate on the same day the individual ceased to be an officer, director, or key employee of Trak or Dart. (DX 306 at ¶ 6(d))

On June 30, 1993, plaintiff was removed from all positions at Dart and all its subsidiaries. (DX 324–326) On August 4, 1993, Herbert Haft, on behalf of Dart, Crown and Trak, informed plaintiff via letter that the four unexercised options to purchase 20,000 shares of Crown stock terminated on July 1, 1993; the four unexercised options to purchase Dart stock under the 1981 Dart Plan terminated on July 1, 1993; the one unexercised option to purchase Dart stock under the 1992 Dart Plan would terminate if the outside directors concluded that plaintiff was terminated for good cause; and the four unexercised options to purchase Trak stock terminated on July 1, 1993. (D.I. 13 at ¶¶ 65–67; PX 384; PX 385)

## C. Total Beverage—Count IX

On September 10, 1987, the Dart Board of Directors ("Dart Board") adopted the following resolution:

> [T]he Board believes it is appropriate for Herbert H. Haft and Robert M. Haft each to have the option to participate individually in acquisitions of other companies by the Corporation, either (i) on the same terms and conditions as management of the acquired company participates, (ii) by the rights of each to acquire a 10% interest in the acquisition company on an equivalent basis as the Corporation, or (iii) an equitable combination of (i) and (ii).

(D.I. 98, Ex A at ¶ 30; DX 215) Director Claudine Malone proposed the resolution after discussions about rewarding both plaintiff and his father for their extraordinary contributions to Dart's acquisition efforts. (D.I. 146 at 323)

Richard Koll, Dart's Chief Financial Officer at the time, testified at trial that the resolution was to apply to "[a]ny acquisition in whole or in part made by Dart...." *Id.*

However, as to whether he understood the resolution to apply to an acquisition of Crown shares or of a company already owned by Dart, Koll's testimony was more equivocal.

> [T]hey [the Dart Board] wanted the Hafts to participate in any acquisition. So if the repurchase of the remaining [shares] of Trak would be considered an acquisition, I would imagine if Herbert or Robert **pushed the issue,** that would have been the case.
>
> \* \* \* \* \* \*
>
> I think if they [Herbert and Robert Haft] **forced the issue,** if they came back and said this is what we understood it [the resolution] to mean, the board **probably** would have approved that. Or did approve that through this resolution.

(*Id.* at 326–327) (emphasis added). Plaintiff testified at trial that the term "acquisition" in the resolution referred to "anything that we [Dart] purchased." (D.I. 154 at 2923)

Plaintiff and Herbert Haft obtained a 10% interest in an acquisition pursuant to the resolution prior to the current dispute. In 1989, Dart acquired through a subsidiary, Dart/SFW Corp. ("Dart/SFW"), a 50% interest in Jumbo Food Stores, Inc., subsequently renamed Shoppers Food Warehouse Corporation ("SFW"). (D.I. 146 at 324; PX 297 at 104; PX 310 at HH417674) Pursuant to the resolution, in 1989, plaintiff and Herbert Haft each acquired a 10% interest in Dart/SFW, the corporation holding Dart's interest in SFW. (D.I. 154 at 2924–2925; PX 311 at WW551112) This was done through a separate contract. (*Id.*; DX 216) Plaintiff testified that a separate option agreement was not contemplated by the Dart Board when it passed said resolution, but was done as an accommodation to Dart, whose interest in SFW would be diluted to less that 50% if Herbert Haft and plaintiff each acquired a 10% interest directly. (D.I. 154 at 2925) This separate agreement stated the price, exercise period, and buyback provision of the option. (DX 216) Plaintiff further asserted that this contract was never ratified by the Dart Board, nor is there any evidence such ratification was necessary, before taking effect. (D.I. 154 at 2526)

On January 26, 1993, Dart organized Total Beverage Corporation ("Total Beverage Corp."). On February 27, 1993, Total Beverage G.B., Inc., a wholly owned subsidiary of Total Beverage Corp., purchased from Total Beverage, Va. Corp. (a subsidiary of SFW) all the assets of the Total Beverage store located in Chantilly, Virginia. (PX 297 at 7, 107; DX 184) After the contractual adjustments, the final purchase price was $1,494,-000, not including the loss sharing provision. (*Id.*) Since the aforementioned purchase, Total Beverage Corp. has opened additional Total Beverage stores. (PX 297 at 7) Ron Marshall, Chief Financial Officer at Dart, testified at trial that plaintiff directed Marshall to draft a separate option agreement to obtain plaintiff's 10% interest in "Total Beverage." (D.I. 153 at 2448)

## III. DISCUSSION

### A. Incentive Stock Agreement—Count III

The jury determined that Crown did not terminate plaintiff for just cause, nor did plaintiff voluntarily terminate his employment with Crown. (D.I. 133) Therefore, Crown breached the ISA by failing to issue to plaintiff an unrestricted certificate for 100,000 shares of Crown stock, after Crown terminated him without just cause on June 30, 1993. In his complaint, plaintiff requested either injunctive relief or compensatory damages. It was not until the time of the pretrial order that plaintiff identified damages as the primary remedy sought. Defendants understood this identification. (D.I. 164 at 2)

"As a general rule, a party may have as many remedies as the law gives provided they are consistent." *Abdallah v. Abdallah,* 359 F.2d 170, 174 (3d Cir.1966); *see also Medcom Holding Co. v. Baxter Travenol Lab.,* 984 F.2d 223, 228 (7th Cir.1993). In a breach of contract action, a plaintiff's damages are "generally measured by what is necessary to put [plaintiff] in as good a position as [he] would have occupied had there been full performance of the contract." *American General Corp. v. Continental Airlines Corp.,* 622 A.2d 1, 8 (Del.Ch.), *aff'd,* 1992 WL 426435, 1992 Del.LEXIS 509 (Del.

Dec. 28, 1992); *Reiver v. Murdoch & Walsh, P.A.*, 625 F.Supp 998, 1009 (D.Del.1985). Damages for a failure to deliver securities are generally determined by the "highest market price the stock reached within a reasonable time of plaintiff's discovery of the breach." *American General*, 622 A.2d at 8; *Wyndham, Inc. v. Wilmington Trust Co.*, 59 A.2d 456, 459 (Super.Ct.1948).

■ Crown does not contest that, in light of the jury's finding, Crown is liable for its breach of the ISA. (D.I. 160 at 7) However, Crown argues that "[b]y seeking specific performance as his exclusive or preferred remedy and not disavowing his right to pursue this remedy until the Pre–Trial Order was filed, plaintiff sought to **possess** ... rather than sell the shares." *(Id.* at 9) (Emphasis added). Crown further asserts that by doing so, plaintiff assumed the risk that the value of the stock would decrease during litigation and should not now be entitled to the traditional method of computing damages. *(Id.)* Crown argues that the court should determine the price of the shares as the highest market value reached within a reasonable time of when plaintiff selected damages as his sole remedy (August 1994), rather than when plaintiff discovered the breach (August 1993). *(Id.)*

Crown's argument lacks both factual and legal support. Factually, plaintiff did not seek specific performance as his exclusive remedy until the final pretrial order. (D.I. 7 at ¶ 83; 98 at 15) Therefore, the court declines to look to a date other than the traditional discovery date for determining damages.

2. Plaintiff argues without explanation that thirty days is a reasonable time period within which the court should calculate plaintiff's damages. An award of damages, however, "may not be based on 'speculation or guesswork.'" *American General*, 622 A.2d at 12. This "highest value" formula does not allow plaintiff to "pick and choose, with hindsight, a single date to set that value. Rather, the date should be established by resort to a 'constructive replacement' purchase by the plaintiff, i.e., how long it would have taken the plaintiff to replace the securities on the open market." *Id.* at 13. The purpose of the "highest intermediate value" rule is to attempt to valuate the chance that plaintiff may have profit-

■ Legally, the defendants' argument has been rejected on similar facts by the Delaware courts. Defendants in *American General* argued that because plaintiff in that case had the legal ability to sell the stock, but did not attempt to do so, it could not retrieve in damages the "highest intermediate value" measure. *American General*, 622 A.2d at 8. The Delaware Court of Chancery disagreed:

> The injury that the plaintiff suffers is the deprivation of his range of elective action.... To require plaintiff to show that he would have sold his securities, had he been able, is to require him to prove he would have taken the "very steps" that defendant's "wrongful act ... precluded him from taking...."
>
> The defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable. Because it is the defendant who creates this uncertainty, "fundamental justice requires that, as between the plaintiff and the defendant, the perils of such uncertainty should 'be laid at defendant's door.'"

*Id.* at 10 (citations omitted) This court likewise rejects Crown's argument and will apply the traditional rule, calculating damages at the highest market price the stock reached within a reasonable time of plaintiff's discovery of the breach. For the case at bar, that date would be August 5, 1993, the date plaintiff requested in writing that Crown issue an unrestricted stock certificate.[2] (D.I. 98, Ex. A at ¶ 35)

■ Plaintiff has requested, and Crown has not challenged his request for, prejudg-

ed from a rise in value in the stock at issue, had he had control over it. *Id.* at 10.

Plaintiff has offered no evidence in support of his claim that thirty days is reasonable. Nor has plaintiff offered any evidence concerning the length of time it would have taken him to replace these securities on the open market. The Delaware Court of Chancery was faced with a similar situation in *American General* and determined that the date from which to measure damages is the date of plaintiff's knowledge of defendant's breach. *Id.* at 13. Similarly, this court has determined the damages based upon the cost per share of Crown stock on August 5, 1993: $23.50. Fed.R.Evid. 201(d). (D.I. 159, Ex A).

ment interest. *Wyndham,* 59 A.2d at 459. "Because this is a diversity suit on a contract, the law of the forum state, Delaware, relating to prejudgment interest applies in the absence of a rate set by the agreement between the parties. Under Delaware law, prejudgment or moratory interest has been permitted as part of the damages in cases which involved a breach of contract." *F.E. Meyers Co. v. Pipe Maintenance Services, Inc.,* 599 F.Supp. 697, 704 (D.Del 1984); *see also American Original Corp. v. Legend, Inc.,* 689 F.Supp. 372, 383 (D.Del.1988). The appropriate rate of interest is 5% over the Federal Reserve Discount Rate on the day of the highest value of the stock. *Id.;* 6 Del.C. § 2301(a); *Miller v. Newsweek, Inc.,* 675 F.Supp. 872, 877 (D.Del.1987). The Federal Reserve Discount Rate during the month of August was 3%. Fed.R.Evid. 201(b), (d), & (f). (D.I. 159, Ex. B) Therefore, the court will apply a prejudgment interest rate of 8%.

Therefore, plaintiff is entitled to $2,146,250 ($2,350,000, less the $203,750 due under the promissory note) plus prejudgment interest at 8% and postjudgment interest pursuant to 28 U.S.C. § 1961.

## B. Stock Options—Count VII

■ Wrongful termination of an employee under a fixed term contract precludes an employer from denying an employee stock option rights. *Haag v. Int'l Telephone and Telegraph Corp.,* 324 F.2d 205, 208 (7th Cir. 1963); *Gaines v. Monroe Calculating Mach. Co.,* 78 N.J.Super. 168, 188 A.2d 179 (App. Div.1963); *Langer v. Iowa Beef Packers, Inc.,* 420 F.2d 365, 368 (8th Cir.1970). Crown and Dart wrongfully terminated plaintiff from employment. Defendants, therefore, cannot deny plaintiff his stock option rights under the various stock option plans.

### 1. 1981 and 1992 Dart Plans

■ Dart issued four options to plaintiff under the 1981 Dart Plan; none were exercised, and two expired, one in July of 1993 and the other in July of 1994. Dart issued one option to plaintiff under the 1992 Dart Plan. Dart argues that plaintiff is entitled to none of these options. Dart focusses on the language in the Dart Plans which states that,

if terminated for any reason other than unlawful or illegal conduct or malfeasance, the option will terminate three months after employment ceases. Dart places significance on this clause because, it argues, the language indicates that the parties contracted such that plaintiff would assume the risk that defendant would prevent or hinder his rights to exercise his options. (D.I. 160 at 17)

Dart's position is incorrect both factually and legally. Factually, with respect to the 1981 Dart Plan, the clause cited by Dart only applies to options created prior to 1986. (DX 304 at § 15A) None of the options at issue were created before 1986. Legally, the argument is also without merit with respect to both Dart Plans. Such has been reflected in the law from other jurisdictions adopted by this court in its August opinion. The proposition that an employee would contract with his employer and assume the risk of losing his stock options if the employer terminated him without cause is "inconceivable." *Gaines,* 188 A.2d at 186; *Langer,* 420 F.2d at 369 ("We cannot believe that the parties here intended that the optionee give full consideration under the agreement and then be deprived of his right to exercise the option. . . ."). Therefore, the court finds that the clause at issue does not indicate that plaintiff contracted to assume the risk that defendant would hinder his right to exercise his options. Consequently, he has a right to exercise said options.

### 2. Extension of Time

Plaintiff seeks an extension of time to exercise two categories of options. With respect to options that expired prior to trial (two 1981 Dart Plan options; one Crown Plan option; and one Trak Plan option), plaintiff requests that the time period during which he may exercise these option be extended for a period equal to the time between June 30, 1993 and the scheduled expiration of those options. Defendants object to this request, stating that plaintiff chose not to attempt to exercise these options and cannot now breathe life into them. (D.I. 160 at 12–14; 16)

Defendants' argument, however, ignores the very reason that plaintiff could not exer-

cise those options: defendants' actions. Not only did Crown and Dart wrongfully terminate plaintiff on June 30, 1993, but on August 4, 1993, Herbert Haft, on behalf of both Crown and Dart, informed plaintiff in writing that all options between plaintiff and Dart, Crown or Trak were terminated. (PX 384; PX 385; D.I. 13 at ¶ 67) Any effort on behalf of plaintiff to exercise them would have been futile.

█ Because defendants are the cause for plaintiff's failure to exercise these options, defendants cannot benefit from their wrongdoings. *Bertero v. National General Corp.*, 254 Cal.App.2d 126, 62 Cal.Rptr. 714, 726 (1967). Therefore, the court will extend the time to exercise the options which expired during the pendency of this case for a period of time equal to the period of time between June 30, 1993 and their expiration at the price of said stock on June 30, 1993. *Id.*

With respect to those options which have not expired, plaintiff requests that they also be extended for the period of time equivalent to the time between June 30, 1993 and judgment at the price as of June 30, 1993. The court finds the request for an extension reasonable, as it would restore to plaintiff the time to exercise the options that he would have had, but for defendants' breach. Because the additional time most accurately restores what plaintiff lost, the court declines to also order that the price of the stock be what it was on June 30, 1993.

### 3. Trak Plan

█ Although plaintiff was not an employee, officer, or director of Trak, the Trak Plan was designed as an incentive to directors, officers or key employees in Trak, its subsidiaries, and its parent company, Dart. When Dart wrongfully terminated plaintiff from his various roles at Dart on June 30, 1993, it prevented plaintiff from exercising the options to which he had a right under the Trak Plan. On behalf of Trak, Herbert Haft

informed plaintiff of such on August 4, 1993. (D.I. 13 at ¶ 67)

Trak argues that because plaintiff was never an employee of Trak and because there was no finding that Trak breached a contract with plaintiff, the doctrine that a party to a contract cannot benefit from its own breach does not apply to the case at bar. Therefore, according to Trak, plaintiff remains without a right to exercise said options.

This argument ignores the factual realities of this case and is a gross example of form over substance. First, it ignores the fact that Herbert Haft, on behalf of Trak, informed plaintiff by letter that his options were terminated. (D.I. 13 at ¶ 67) The basis for said letter can only be plaintiff's wrongful termination by Dart on June 30, 1993. Additionally, Dart own 65% of Trak. (PX 297 at 104) Thus, Dart would benefit from precluding plaintiff from acquiring any portion of its subsidiary's stock. Finally, the spirit of the doctrine outlined above is that an optionor in a stock option cannot benefit from its own wrongdoing. It follows, therefore, that it cannot benefit from the wrongdoing of its parent company. To hold otherwise would fly in the face of this rule.

Therefore, plaintiff is entitled to exercise his options under the Trak Plan. As with the other plans, his options shall be extended for the appropriate period. The time to exercise the option which has expired shall be extended for a period of time equal to the period of time between June 30, 1993 and its expiration at the price of said stock on June 30, 1993. The time to exercise the remaining unexpired options shall be extended for the period of time equal to the time between June 30, 1993 and judgment, but the court also declines to order that the price of this stock will be what it was on June 30, 1993.

### C. Total Beverage—Count IX [3]

As stated in the court's summary judgment opinion:

---

3. The parties have not developed a clear record of the actual transaction which constituted the purchase of what the parties refer to loosely as "Total Beverage." Based on certain documents of record, the court understands the transaction to have occurred as follows: Dart organized To-

tal Beverage Corp., as a wholly owned subsidiary, on January 7, 1993 (PX 297 at 7, 104); Total Beverage Corp. created a wholly owned subsidiary, Total Beverage, G.B., sometime thereafter (*Id.* at 104); Total Beverage, G.B. purchased all the assets of Total Beverage, Va. Corp.

Corporate resolutions alone do not constitute a contract. To make a vote of a corporation binding on the corporation, it is necessary, as in the case of a deed or promissory note, that there be an offer of the obligation by the one party to the other, and its acceptance by the other.... However there is no doubt that a resolution may be so specific and in such terms as itself to constitute a contract where accepted and relied on by the other party. Where resolutions do constitute contracts between the parties, it is the duty of the court to construe them to ascertain the intention of the parties, and that intention must be gathered from the language of the resolutions, read in the light of the circumstances existing at the time.

*Fletcher Cyc. Corp.* § 431 (Perm.Ed.1990); *see also Air Traffic & Service Corp. v. Fay,* 196 F.2d 40, 43 n. 4 (D.C.Cir.1952) (a Board resolution, under Delaware law, can be the practical equivalent of a contract). The court has determined that the parties intended this resolution to be a contract. As the court indicated at the summary judgment stage, the resolution represents an offer, and the plaintiff's obtaining a 10% interest in Dart/SFW indicates an acceptance.

What remains at issue is whether the record contains indicia sufficient to enable the court to divine the terms of the contract,[4] or whether the terms are so ambiguous as to be susceptible to different meanings.

To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we "hear the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."

*Teamsters Industrial. Emp. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir.1993) (*quoting Sheet Metal Work-*

*ers Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1284 (3d Cir.1991).). The United States Court of Appeals for the Third Circuit has further commented that a court should consider the contract's language, meanings suggested by counsel, and extrinsic evidence offered in support of that interpretation. *Id.*

In making their proffers, the parties focus their analyses, as does the court, on two specific terms: "acquisition" and "equivalent basis." The parties address the meaning of the term "acquisition" to determine whether it would apply to the transaction at issue, that is the acquisition of the assets of Total Beverage, Va. Corp.. Dart argues that this term does not apply to the purchase of 100% of the assets of affiliated companies. Plaintiff argues that an "acquisition" constitutes a purchase of all the assets of a company and, because Dart purchased all Total Beverage, Va. Corp.'s assets, it "acquired" what is now Total Beverage Corp. for the purposes of this resolution.

 The record supports plaintiff's interpretation of this language. (D.I. 146 at 326–327) The court concludes, therefore, that the term "acquisition" is not ambiguous but was intended to be applied to a broad scope of transactions, including the one at issue.

In offering their arguments as to whether the resolution, with respect to the term "equivalent basis," is ambiguous, both parties place significance on plaintiff's previous exercise of this resolution with respect to Dart/SFW. In that transaction, plaintiff did not simply pay 10% of Dart's purchase price and receive a 10% interest in Dart/SFW. Rather, he entered into a separate option contract which granted him the option in the future to purchase stock in Dart/SFW. Plaintiff offered uncontroverted testimony that this was simply an accommodation on plaintiff and his father's part to Dart's request that they not each directly purchase a 10% interest. Dart argues that this indicates that the term

(a wholly owned subsidiary of SFW) on February 27, 1993. (DX 184) Dart owns a 50% interest in SFW through a wholly owned subsidiary, Dart/SFW. (PX 311 at WW551112).

**4.** Plaintiff correctly notes that the court ruled at the summary judgment stage that the only ambiguous term it found in the resolution was "ac-

quisition." However, the court is not bound by that determination, as at the summary judgment stage the record was incomplete. Now, with a complete record, the court will revisit this issue. No prejudice results given the fact that both parties have briefed the issue. (D.I. 165 at 16–23).

"equivalent basis" in the resolution is ambiguous and that the parties intended that the specific terms of any acquisition would be worked out in a separate binding contract.

■ In order for an agreement to be legally binding, it must be "reasonably definite and certain in its terms." *Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons v. Hiram Grand Lodge Masonic Temple*, 80 A.2d 294, 295 (Del.Ch.1951). The court finds the phrase "equivalent basis" meets this test, in terms of both the purchase price plaintiff would be expected to pay, as well as what he would receive in consideration for that payment.

With respect to price, Dart argues that the price of the acquisition at issue is impossible to determine because of the significant amount of investment by Dart into "Total Beverage."[5] (D.I. 160 at 27) Plaintiff argues that these cash investments by Dart are not properly regarded as part of the price Dart paid for the Total Beverage store. The court agrees with plaintiff. The actual purchase price of the assets of Total Beverage, Va. Corp. is explicitly defined in the Asset Purchase Agreement as the closing price of $550,000 and the inventory purchase price. (DX 184 at § 3.1) While some additional prorations were necessarily made to the price, the price was definite enough to be recorded as $1,494,000 in Dart's 10K filing for fiscal year ending January 31, 1994. (PX 297) Therefore, 10% of the purchase price,

on an equivalent basis as Dart, would be $149,400.

■ "Equivalent basis" is also not ambiguous with respect to the entity in which plaintiff may purchase an interest, that is the acquisition. The record indicates that the acquisition is comprised of all the assets of Total Beverage, Va. Corp.. These assets were purchased, not by Total Beverage Corp., but by Total Beverage, G.B.. The "acquisition company," therefore, in which plaintiff may purchase an interest is Total Beverage, G.B., not Total Beverage Corp.[6]

■ Unfortunately, the parties have not clearly defined the distinction between Total Beverage, G.B. and Total Beverage Corp.[7] The court finds, however, that it is not necessary to know what Total Beverage, G.B. constitutes. Plaintiff testified that when one purchases an interest in a company in the early stages of its development, he has a right to that interest regardless of whatever that company grows to become. (D.I. 154 at 2937) The court agrees that plaintiff has the right to purchase 10% of whatever Total Beverage, G.B. has become, for $149,400.[8] However, plaintiff does not have that same right with respect to the separate corporate entity of Total Beverage Corp. which did not acquire the assets of the Total Beverage, Va. Corp. to become the acquisition company. (D.I. 7 at ¶ 107)

■ In summary, "[t]he terms of a contract are reasonably certain if they provide a

5. The record is unclear as to whether defendants refer to investments in Total Beverage Corp. or Total Beverage, G.B. (*See* D.I. 153 at 2455).

6. Moreover, past dealings of contracting parties pursuant to an agreement are probative of a party's intent. *Teamsters*, 989 F.2d at 137; *see also Rosenberg v. Equitable Trust Co.*, 68 F.Supp. 991, 994–995 (D.Del.1946), *aff'd*, 165 F.2d 786 (3d Cir.1948). In 1989, when the parties activated this resolution, plaintiff and Herbert Haft purchased options in the corporation that was holding the acquired stock, Dart/SFW. (DX 216) Similarly, in the "Total Beverage" transaction, the company that is holding the acquired assets appears to be Total Beverage, G.B.

7. Dart argues that Total Beverage, G.B. consists of simply the assets initially purchased from Total Beverage, Va., and that all the other new stores are within Total Beverage Corp. (D.I. 160

at 22) However, the citations Dart offers to support this proposition do not do so adequately. Plaintiff notably, however, has not disputed this characterization.

8. Because of a loose use of the term "Total Beverage" the record is not entirely clear if Dart has invested substantially in Total Beverage Corp. or Total Beverage, G.B. (D.I. 153 at 2455, 2466) The above result is unchanged even if Dart invested in Total Beverage, G.B. As effectively demonstrated on cross examination, a parent company can invest in a subsidiary in one of two methods: loan or equity. If the investment passes in equity, it is reflected as an investment in the subsidiary and is on the subsidiary's books as such. If, however, it passes as a loan, it is reflected on the subsidiary's books as a loan. If one were to gain interest in such a subsidiary company, one's interest would be in a company with significant debt. (*Id.* at 2465–66).

basis for determining the existence of a breach and for giving an appropriate remedy." *Restatement (Second) of Contracts* § 33 (1981). The court has such a basis.

## IV. CONCLUSION

For the reasons stated herein, judgment shall be entered in favor of plaintiff. An order consistent with this opinion shall issue.